FREDERICK MEFFERT STRIPE, A Minor, by JAMES A. SHANNON, His Guardian, v. ANNA MEFFERT, MARTIN E. LAWSON and SILVIA C. BARRICK, Appellants.

Division One, April 9, 1921.

1. **TRIAL: Special Verdict: Incomplete Determination: Motion for New Trial.** Where there is a special verdict, leaving some of the issues to be determined, a motion for a new trial filed within four days after their determination, is timely filed.

2. **APPEAL: Trial de Novo in Supreme Court.** Where a case was treated in the trial court as an equity case with the acquiescence and consent of the plaintiff, he cannot object to its being so treated on appeal, and therefore this court will not be limited to

consideration of questions of law, but may try the case *de novo* on the facts.

3. **ILLEGAL MARRIAGE**: Divorce: Adultery: Legitimacy of Children. Section 342, Revised Statutes 1909, provides that "the issue of all marriages decreed null in law or dissolved by divorce shall be legitimate." In order that a child may be legitimate within the meaning of this statute, there must have been not only a marriage between the parents, but such a marriage as would be decreed null in law or dissolved by divorce in a proceeding in equity between them. In an action to annul a marriage in equity, for any reason, or for divorce, if both parties knowingly lived in adultery, there would be no marriage to annul and neither would be an innocent or injured party; neither would come into court with clean hands, and no relief could be granted to either. Unless the marriage is entered into by one or both of the parents honestly, innocently and in good faith it is not such a marriage as is contemplated by this section.

4. **LEGITIMATION OF CHILDREN**. Secion 341, Revised Statutes 1909, provides that "if a man, having by a woman a child or children, shall afterward intermarry with her and shall recognize such child or children to be his, they shall thereby be legitimated." This applies to cases where the relationship between the parties at the time the child was conceived was illegal and criminal as to both parents. In such case a subsequent legal marriage and recognition is necessary to legitimacy.

5. ——: Adultery: Guilty Knowledge of Parties. Where the evidence showed that both the parents were knowingly guilty of adultery, the child cannot be held ligitimate under Section 342 at all, and not under Section 341 unless there has been a subsequent marriage between the parents accompanied by recognition by the father.

6. ——: ——: Non-Access: Presumption. In cases where the question is whether the paramour or husband of the mother is the father of the child, the non-access of the husband is required to be shown by clear and convincing proof; otherwise, the presumption is that the husband, and not the paramour, is the father.

Appeal from Jackson Circuit Court.—*Hon. Allen C. Southern*, Judge.

REVERSED.

*Lathrop, Morrow, Fox & Moore* and *George W. Day* for appellants.

(1) The case was tried in the court below as one in equity; all parties are bound by that theory. Har-

wood v. Toms, 130 Mo. 225; Roselle v. Beckmeir, 134 Mo. 380. (2) The motion for new trial was filed in time. The cases which hold that the time for filing a motion for new trial should be reckoned from the date if the return of the verdict and not from the date of the judgment are cases in which the return of the verdict marked the close of the trial. (3) The judgment here can be sustained only upon a finding that there is in the record sufficient evidence showing there was a marriage between Dr. Joseph F. Meffert and Anna Marie Stripe, which the law deems null. R. S. 1909, sec. 342. (4) Unless at least one of the parties to an alleged common-law marriage enters it in good faith, believing the other party to it competent to contract marriage, the issue of the cohabitation of the parties is not legitimate. Green v. Green, 126 Mo. 17; Nelson v. Jones, 245 Mo. 579. (5) Both Dr. Meffert and Mrs. Stripe knew that Mrs Stripe was the lawful wife of another, when they assumed the relation testified to by her. Good faith was, therefore, lacking in both of them; the relation was meretricious and not that of a marriage deemed null in law. (6) Every child born in wedlock is presumed to be legitimate. Proof to the contrary must show impossibility of access or of procreation by the husband. Johnson v. Johnson, 30 Mo. 72; Drake v. Hosp. Assn., 266 Mo. 1.

*Gamble, Kennard & Trusty* and *Marley & Reed* for respondent.

(1) This case came on in due course for trial, as a jury case, and although appellants insisted that it was an equity case not triable by a jury, and objected to a jury trial, the respondent was equally insistent that it was a jury case and insisted upon a trial to a jury. The court took the view of the respondent and tried the case as a jury case; and all action of the court after the return of the verdict by the jury was influenced and induced by the appellants and not by the respondent. Respondent

desires to raise the point that as to him there is nothing but the record proper before this court for its consideration. Neither the petition nor any of the answers claim as to respondent, any equitable rights nor invokes the exercise of the powers of a chancellor. That in fact the petition and answers clearly show that the action was an action at law triable to a jury. Kline v. Greeschner, 219 S. W. 652; Hays v. McLaughlin, 217 S. W. 263; Newbrough v. Moore, 202 S. W. 549; Hunter v. Moore, 202 S. W. 545; Koehler v. Rowland, 275 Mo. 581, 205 S. W. 219; Traccy v. Coppage, 213 S. W. 38; Dowd v. Bond, 199 S. W. 954; Bacon v. Theiss, 208 S. W. 254; Thompson v. Stillwell, 253 Mo. 89; Lee v. Conran, 213 Mo. 404; Wimpey v. Lawrence, 208 S. W. 58; Tolar v. Edwards, 249 Mo. 158; Minor v. Burton, 228 Mo. 563; Miller v. Lloyd, 204 S. W. 258; Brooks v. Gaffin, 192 Mo. 228; Hauser v. Murray, 256 Mo. 84; Minicum v. Solar, 183 S. W. 1037; Brook v. Roberts, 195 S W. 1021; Coulson v. Le Plant, 196 S. W. 1144; Brandt v. Brents, 177 S. W. 377; McLarty v. Griggs, 222 S. W. 391; Brooks v. Roberts, 220 S. W. 11; St. Louis Union Trust Co. v. Hill, 223 S. W. 435; Mooneyham v. Wynatt, 222 S. W. 451.    (2)  Sec. 342, R. S. 1909, should be liberally construed in favor of the child.  The strict requirement being only as to its paternity.  Watt v. Owens, 62 Wis. 512; Blythe v. Byers, 19 L. R. A. 40; In re Shipp, 168 Cal. 641; Brown v. Legion of Honor, 78 N. W. 73; Morin v. Holiday, 30 Ind. App. 201.  Children are unconscious of the marriage and the criminality thereof does not affect them, nor is it to be considered when passing upon their claim to legitimacy.  Dyer v. Brannock, 66 Mo. 404; Brewer v. Bloucher, 14 Pet. 178; Stones v. Keeling, 5 Call. (Va.) 143; Heckert v. Hile, 90 Va. 391; Leonard v. Braswell, 99 Ky. 528; Wright v. Lore, 12 Ohio St. 619; Harris v. Harris, 85 Ky. 49; Hartwell v. Jackson, 7 Tex. 579. The statute should be construed to carry out its humane purpose.  Turnmier v. Mayes, 121 Tenn. 45; In re Jessupp, 81 Cal. 408; Christopher v. Munger, 61 Fla. 513; Lincecum v. Lincecum, 3 Mo. 441; Johnson v. Johnson,

287 Mo.—24

30 Mo. 80; Buchanan v. Harvey, 35 Mo. 276; Nelson v. Jones, 245 Mo. 597; Evatt v. Miller, 114 Ark. 84; Mund v. Rebanme, 51 Colo: 134; Leonard v. Brasswell, 99 Ky. 533; Hutchins v. Kimmell, 31 Mich. 132; Morris v. Williams, 39 Ohio St. 557; Watts v. Owens, 62 Wis. 512. (3) The verdict marked the end of the trial, as it settled all the issues of fact and left the court no alternative except to enter judgment for plaintiff or grant a new trial; and defendant's failure to file such motion within four days after verdict means that the appeal brings nothing here for review except the record proper, and as to that no error is assigned. R. S. 1909, secs. 1988, 1989, 1990; Green v. Whaley, 271 Mo. 636; DeSoto v. Ins. Co., 102 Mo. App. 1; Hall v. Mullanphy, 16 Mo. App. 454; Cockrell v. McIntyre, 161 Mo. 59; Waddington v. Lane, 220 Mo. 387; Young v. Downey, 150 Mo. 317; City of St. Louis v. Boyce, 129 Mo. App. 443; Brubaker v. Brubaker, 74 Kan. 220, 86 Pac. 455; Spalding v. Mayhill, 27 Mo. 377; Shipp v. Snyder, 121 Mo. 155.

SMALL, C.—Suit to quiet title to real estate in Jackson and Clay Counties. Petition is in the conventional form, claiming that plaintiff owns the entire fee title in the property sued for. No equitable title alleged, nor equitable relief prayed for on face of petition.

The answer of defendant Anna Meffert was a general denial. The answer of defendant Lawson, besides a general denial, averred that neither plaintiff nor defendant Sylvia C. Barrick had any interest, but that said Lawson, as executor of the last will of Joseph F. Meffert, deceased, under said will, holds the entire fee-simple title for his co-defendant, Anna Meffert. Defendant Sylvia C. Barrick's answer was to the same purport as the answer of defendant Lawson.

After the jury was sworn it appeared from the opening statement of plaintiff's counsel that both parties claimed under said Joseph F. Meffert, as a common source of title. That plaintiff claimed he was the son of said Meffert, and was born of his marriage with Mrs.

Marie Stripe, while said Mrs. Stripe was the wife of William H. Stripe, but was, nevertheless, his legitimate child under Section 342, Revised Statutes 1909.

Defendants thereupon objected to trying the case before a jury, because they "don't try equitable matters." The court overruled defendants' objection, but submitted to the jury the following special questions, which the jury answered in the affirmative, as follows:

"Question No. 1. Was there a marriage on or about September 3, 1914, between Joseph F. Meffert and Anna Marie Stripe?

"We, the jury, answer the foregoing question, Yes.

"A. L. Williams, foreman.

"Question No. 2. Is Frederick Meffert Stripe the issue of said marriage?

"Yes.

"A. L. Williams, foreman."

Upon the coming in of the verdict, the court made the following entry on the record:

"And now it appearing to the court that there are further issues in this cause, the said jury is discharged from any further consideration of the cause, and this cause is continued until tomorrow morning at 9:30 a. m."

It appears from the evidence before the jury, that plaintiff was born October 6, 1915. That his mother was about 33 years old in the early spring of 1913, when she first met Dr. Joseph F. Meffert, who was and for many years had been a practicing physician in Kansas City, and before coming to Kansas City, in Liberty, Missouri. She was then living with her husband, W. H. Stripe, a carpenter and contractor, who was doing work for Dr. Meffert, who was a man of some means and the owner of a number of houses in Kansas City. At the time, the Stripes had two little daughters aged respectively about four and eight years. They lived at 27th and Indiana Avenue. Dr. Meffert resided at 1622 Prospect Avenue. He was divorced from his wife in 1890, when they lived at Liberty. His former wife and their daughter and

only child, Anna Meffert, lived at Liberty. The Stripes were married in New Jersey, January 1, 1903. Mrs. Stripe had been left some property when her father died. She was then sixteen years old. She never attended the public schools, but was educated at private schools, and was also a graduate of——College, one of the highest class colleges for young women in the country. Her husband, Stripe, was interested with his brothers, one of whom was her guardian, in a manufacturing establishment, and invested and lost her inheritance in the business. They then moved west and had been in Kansas City for several years before she met Doctor Meffert. They became enamoured of each other at their first meeting in the early spring of 1913. Thereafter, he made love to her, and until she went to live with the doctor on September 3, 1914, they often met clandestinely and without her husband's knowledge. This happened two or three times a week. She was in love with Dr. Meffert as much as he was with her. She did not tell her husband of these meetings with the doctor, because "I knew what a disposition he had." She also knew it was wrong, because she was married to Stripe. Over defendants' objection that she was incompetent to testify to her agreement with said Meffert, because he was dead and the plaintiff claimed through and under said agreement, she testified, as follows:

On September 3, 1914 she went to live at the Meffert house. " He wanted me to be his wife and that we live together as man and wife. I told him that was impossible, that I was already married. We simply agreed to live together as husband and wife. Q. What was the agreement? A. We simply agreed to live together. Q. I want to know what the agreement was? A. I agreed to live with him as his wife. He agreed to be my husband and I agreed to be his wife." (Struck out as a conclusion). " He said, ' I will be your husband.' He asked me to come and live with him as his wife, and I told him I thought that would be impossible—that I was already married. He said as long as Mr. Stripe refused to

give me a divorce, and I would live with him as his wife,
Mr. Stripe could not prevent it in any way, and we
would live together as man and wife any way. I didn't see
how I could live there as his wife, when I was not divorced.
He said he would be true to me and love me and take
care of me, all of my life. I told him the same thing.
We made a vow between us, that before God we would
be true to each other. He then put a ring on my finger,
and took off the wedding ring Mr. Stripe had given me.
I was a Protestant, he was a Catholic, and I promised
him, if any child was born of the marriage, I would bring
it up a Catholic. He said he wanted an heir. When that
promise was made, we commenced living together from
that time on, September 3rd, and the baby was born
October 6th the next year. I baptized it a Roman Cath-
olic. During that time, I lived at no other place except
1622 Prospect Avenue, Dr. Meffert's home. He lived with
me at that house all of the time. He was just as a hus-
band could be, loving and kind; until his people came,
there was no friction. He discharged the housekeeper,
and that caused a great deal of trouble. I had her come
back—there was so much scandal—I begged the doctor
to take her back, and he did. I thought she would pro-
tect us. The baby was born at 1622 Prospect. The doc-
tor was very kind to the child. He slept with it, until
a few weeks before he died. He would not let anybody
fix its milk but himself. The whole house was turned
topsy-turvy to take care of that child. Before the baby
came, and I was carrying the child, the doctor opened an
account for me at the Parisian, that I might get things
charged to myself. He introduced me there as his wife.
They found out the doctor had a great deal of money
and some one else had things charged there one time
and he had a great deal of trouble and decided to close
the account. I do not know of his buying clothing for
other women while I was living with him. He ordered a
maternity dress for me and they ordered it specially
from New York. He bought the baby a baby-buggy; his
mother paid something towards the buggy, she wanted to.

From September 3rd, until the baby was born, I did not entertain or receive attention from any other man than Dr. Meffert. He told everybody about his beautiful baby. I was not there when the doctor died. I was at 36th and Agnes, me and the baby. At 1622 Prospect, he had his housekeeper and his mother. I left them on account of the friction and the scandal was so terrible that the doctor and I planned to go to California. Myself, the housekeeper, his mother and his brother's wife lived there. He instructed the banks to pay my checks. I signed, 'Mrs. J. F. Meffert.' He introduced me at the German American Bank as his wife. I was known at Nance's restaurant as his wife. We went everywhere together. At the Royal Theatre he told the usher to take his wife down and weigh her. The doctor showed me a will he had drawn after the baby was born. He said Mr. Lawson said, 'it was a fine and dandy will.' I have not seen or heard of it since. I took Mr. Lawson's word for it, there was no other will. My house was broken into while I was at the funeral and every paper taken out. Dr. Meffert said that he had provided in his will for his mother and me and the boy. We were left out and didn't get anything. He said he fixed a piece of property for me at 15th and Prospect for life, and at my death it would go to the baby. I have two little girls by my former husband—no boy. The boy is the picture of the doctor." (Struck out by the court). " After the baby was born, he tried to sell a piece of property at any price so he could get his wife and the baby out of the country on account of scandal and to protect the baby as well as he could from the 'threatening mobs.' The baby was six months old, when he died. He told numerous persons the baby was his boy. I had no sexual relations with Stripe after September 3rd, until the baby was born. I went to Stripe's house in March when the children had diphtheria. He came to 1622 Prospect Avenue several times to give the babies (children) outings. He would meet them outside and take them home. Doctor would usually stand at the door. He didn't like it. When my little girl was

sick, he objected to my going there alone, and took me out himself and treated the little girl. That was the only time I went to Stripe's house." She did not tell Stripe about her vow with the doctor. Tried to conceal it as long as she could. Did not want the world to know. Asked him to give her a divorce, but he refused. Wanted to get a divorce from Stripe, so she could legally marry Dr. Meffert. She knew she had to have a divorce, before she could legally marry him. After September 3, 1914, Dr. Meffert called her Mrs. Meffert to all strangers and while there was no scandal. But when people knew her as Stripe, she had to shield " it as best I could. The scandal was about me living with the doctor, as his wife, and Mr. Stripe felt so bad." Stripe would not speak to her any more after she commenced living with the doctor; he was in such a frame of mind, she would not speak to him. After she commenced living with the doctor, Stripe fitted up one of the doctor's houses on 27th Street, near Indiana, and moved into it and kept his office there. That was about a block from where they had lived. The two little girls stayed a great part of the time with her at Doctor Meffert's, and part of the time with Stripe or his sister. Dr. Meffert gave her numerous checks payable to ''Marie Stripe, because so many people knew me as Mrs. Stripe— the scandal was so great I wanted to shield myself and the baby as much as I could." When the little girls were at Stripe's house, they would call her, when their daddy was gone, ''and I would go out to see them.'' There were lots of checks made out to "Mrs. Meffert." The doctor told the bank at Liberty to take her signature, " M. Meffert." She only signed one that way, because there was so much talk and scandal. She had none of the doctor's checks. She supposed the defendants had them. The checks were all made to " Mrs. Stripe," or "Marie Stripe," to shield her from the public. She frequently collected rents for the doctor for all of the property near where Stripe " bached " on 27th and Indiana. During the period covered by the checks, shown in evidence, from December, 1914, to March, 1916, " people usually knew her as ' Mrs. Stripe,' " Mr. Stripe continued at his work for

the doctor after September 3, 1914, the same as before, and the doctor was owing him money for such work when he died. In March, 1916, the doctor moved her and the child away from his home, 1622 Prospect, to 36th and Agnes, because the scandal had become so great. The doctor said his lawyer, Lawson, told him they would be arrested. She expected to have a public ceremony after she was divorced from Stripe. "We thought we were man and wife, but the public did not look at it that way, and we had to please the public and society. The doctor was trying to get a dispensation so we could be married by a priest." She said she filed a divorce suit against Stripe, but if Stripe contested it and said she was getting it to marry another man, she did not suppose she could get the divorce. This suit was filed on May 13, 1915. Besides alleging that " she had always faithfully demeaned herself " as Stripe's wife, the petition in her divorce suit further alleged " that he had offered her such indignities as to render her condition intolerable," and also, that " plaintiff is now again pregnant with child of which she expects to be delivered about the month of September. That since defendant became aware of such pregnancy, he has been more abusive than ever." The petition appeared to be duly sworn to and subscribed by her. She admitted signing it, but says she never read it, did not know what was in it, that it was prepared by the lawyer from information given him by the doctor. When she first went to the doctor's house, Mrs. Dresslaer, his housekeeper, and the doctor's niece, Miss Baker, were there. "Mrs. Dresslaer said, we weren't married; we said, we were. She kept saying this. She was such a sour old woman. I was not used to anything like that. Miss Baker told the doctor, if I was going to live there as his wife, she would leave. He told her to go, and she left. They both brought in gossip. The doctor had a lot of money, and they were afraid they would lose it. They said I ought to get a divorce and then marry the doctor. This scandal happened all the time. The doctor had a great many patients, and they would bring in news and say things. The doctor told some

of them it was none of their business. Some of them had the impertinence to tell him he shouldn't have me there— just gossiping women. At one time the doctor offered Mr. Stripe twenty-thousand dollars, if he would give me up, and he refused. The two men could really never meet without going to pieces. Mr. Stripe would not agree, because he didn't want me to marry the doctor." Witness's divorce case was never tried, but after the doctor died, Stripe got a divorce from her on the ground of adultery with Dr. Meffert. She said the doctor told her that "under the laws of Missouri, he knew I could live with him as his wife and nobody could bother us." That "if I lived with him as his wife, if I never got a divorce, our children would be legitimate. I trusted him and believed everything he told me." He told her, he made a will providing for her and the baby and that his attorney, Mr. Lawson, had it. Meffert died about six months after the child was born, while its mother lived at 36th and Agnes. The doctor visited her there during the day time, but still kept up his establishment at 1622 Prospect Avenue.

The following witnesses also testified for plaintiff, as follows:

Charles Meffert, the brother of the doctor, and his wife, testified that the doctor introduced plaintiff's mother to them, as "their sister-in-law." But, on cross-examination, Charles testified repeatedly that the doctor told him that her husband, Stripe, was living, and she was going to get a divorce, and then they would be married. He was just keeping her there until that time. Charles was recalled to the stand next day by plaintiff, and said he had thought it all over again, and that he had made a mistake, that what the doctor said was, " She is my wife, and after the divorce, we are going to be publicly married." Both Charles and his wife testified that the doctor said the child was his. He resembled the doctor. Charles also testified that defendant Sylvia C. Barrick was the daughter of the doctor by a woman who claimed to be his wife by " a secret marriage or something," but the only marriage of the doctor that he knew anything about was to defendant Ann Meffert's mother.

M. S. Murray, testified: That Mrs. Fellows introduced plaintiff's mother to him, as he recollected, as "Mrs. Meffert." Dr. Meffert was in the room at the time.

Another witness said that she lived near Mrs. Stripe, when the latter lived at 36th and Agnes—one day she saw the doctor there, and he played with the child like it was his own son.

Margaret O'Rourke, a patient of the doctor's testified: that shortly after the plaintiff was born, she remembered that the doctor talked about the child as his boy, all the time, and said it looked like him. "The child looks just exactly like him."

L. E. Gunter testified: That the doctor referred to plaintiff's mother as his wife on one occasion, when they were in witness's restaurant, and that she was in a delicate condition. He "kidded the doctor about it."

Defendants' evidence:

John S. Major testified: That he was president of the First National Bank of Liberty, where Dr. Meffert kept his account. He was never told to pay any checks signed by "A. M. Meffert" or "Joseph F. Meffert by A. M. Meffert," or that that party was Meffert's wife. After the doctor's death, his checks, from the time of his last balance were turned over to his administrator. The cashier of the bank also testified to the same effect.

Martin E. Lawson, testified: That he was attorney for Dr. Meffert at Liberty, from 1893 until his death. The doctor was over at Liberty once a week. First knew him in 1890, when his wife obtained a divorce from him; drew up his will, which was read in evidence; never heard him mention Mrs. Stripe. In the month of September, 1914, prepared another will for him. At that time, he came to my office, and told me he wanted to change his will. I got out the original will, and told him I thought it well to read that over before making any changes; he noted down the changes he wanted made and left them with me to write up the new will. I prepared it or had it prepared according to his directions.

When he came in again, he read it over, and suggested a few changes. I told him I would have it recopied. He did not come in for a week. He then read it over, and said it was all right, but he was on a deal to dispose of the 15th Street property, and if he did he might want to make a few minor changes. I said to him, he had been quite sick, "It might be well not to delay matters too long." He said, "The old will will stand, if I don't make this one?" I said "it would," and he replied "all right," and went out and never executed the new will. The new, unexecuted will, dated the "——— day of September 1915," was introduced in evidence, and showed no provision for nor mention of plaintiff or his mother. Witness was the executor of Dr. Meffert's will dated, 1904, which was duly probated and by which the property in question was devised to him as trustee for defendant Anna Meffert, the doctor's daughter. Witness, as such executor, with the witnesses, as required by law, took charge of the property and the papers of Dr. Meffert. He received the canceled checks from the First National Bank of Liberty and none were payable to Mrs. J. F. Meffert or to Mrs. Meffert, and none signed by Mrs. Joseph F. Meffert or A. M. Meffert or Marie Meffert or the doctor's name by any one of that description. There was only one check in the German American Bank, and that was payable to Mrs. Stripe. That balanced the account and was dated March 16, 1915. Mrs. Dresslaer, the doctor's house keeper, presented a claim against the estate for 18 years services, which, with the consent of the doctor's daughter, he allowed. Charles Meffert presented a claim on a note, which witness was resisting on the ground that it had been changed from $29.50 to $2950. The other one for $500 has been changed so as to take it out of the Statute of Limitations. At the time witness consented to allow Mrs. Dresslaer's claim, he had no notice of any other person claiming an interest in the estate, except the deceased's daughter, Anna, and she consented. Witness identified a letter he wrote to Dr. William F. Meffert of Emporia, Kansas, saying he would like to have

a talk with Charley Meffert or his wife, to find out what they knew about the Stripe case, and he might be able to make a proper arrangement, so far as their case was concerned, if he knew what facts they knew about the Stripe case. At that time, Dr. William Meffert and witness were trying to compromise the Charley Meffert case, and this letter was written in response to a conversation they had at Liberty in regard to compromising the case.

George W. Day testified: That he filed the petition for divorce for Mrs. Stripe against her husband, and got all the facts stated in the petition from Mrs. Stripe. She came to his office four or five times before the petition was filed. Got no information from Dr. Meffert, nor any one except Mrs. Stripe. She urged haste. She wanted the custody of the children in peace. When the case came up several times, she was too ill to appear, and it was continued. After her child was born, some one called witness to go out to Dr. Meffert's house to see her. He went, and she said to drop the case, which was done. The information as to her pregnancy, at the time the petition was filed, as therein alleged, was given to him by Mrs. Stripe. Witness had examined abstracts and attended to other matters as attorney for Dr. Meffert for six or seven years before his death. When she consulted witness about her divorce in May, 1915, witness was given her address as 3408 East 27th Street (27th and Indiana), according to the memorandum which he made at that time. After the divorce petition was filed Mr. Ellis told the witness that he represented Stripe, and that Stripe said that Mrs. Stripe and the doctor had been guilty of adultery; that the doctor had alienated her affections, and that he (Stripe) intended to sue the doctor on account thereof.

T. C. Sparks testified: That he was a notary public and swore Mrs. Stripe to her petition for divorce; that she read it over, and said, that she understood and it was all right. Then she swore to it and signed the affidavit in his presence.

L. A. Gladdish, credit man at Harzfeld's, testified: That Mrs. Stripe had no account there in her name, but on December 4, 1914, she signed an application in her name, Marie B. Stripe, for a credit account in the name of Dr. Meffert. She said, she and the doctor were going to get married. This account ran in the doctor's name for about a year, and then he revoked it by a letter. The witness put in evidence, both the application signed by Marie B. Stripe and the letter signed by Dr. Meffert.

Celia Dresslaer, the doctor's housekeeper, for many years before his death, said, that about the first of September, 1914, Mrs. Stripe came to the Doctor's house, 1622 Prospect Avenue, to board. The doctor said, Mrs. Stripe wanted to bring her children and come there to board for a short time until Mr. Stripe got the building fixed up at 27th and Indiana; there were rooms upstairs that they wanted to occupy. Witness objected, because the work would be too hard for her. But Mrs. Stripe came the next day. She said, "I won't be here long and will help with the work." She had one of her little girls with her. She stayed, but did not help much. Witness told the doctor, she could not stand it, and that she would go back to Liberty. She went in November, 1914, but, at the request of the doctor, came back and collected a couple of months' rent for him. Mr. Stripe was there and took his meals several times before witness left. Mrs. Stripe went out nearly every evening and said she was going to 27th and Indiana to see Mr. Stripe. It would be eleven or twelve o'clock sometimes before she got back. That was the situation until witness left in November. She came back and collected the rents for December and January, when the Doctor said, Mrs. Stripe said, she would collect the rents, and witness did not collect any more. Witness returned in March, 1915. The doctor told her Mrs. Stripe had gone, but she came back that same day, and said she had been gone six weeks. In April, the doctor's mother and invalid brother came. Mrs. Stripe was back and forth, but never stayed at night until May when she returned to stay. Witness

could then see what condition Mrs. Stripe was in. Mrs. Stripe said, that she was threatened with a miscarriage, and Mr. Stripe thought it would be cheaper for her to come there and stay, and have the doctor treat her, than have him go to see her. So she came there for treatment. Mr. Stripe came afterwards several times before the child was born and took meals there. He was there the evening before the child was born. After the child was born, Mr. Stripe called her up over the 'phone and witness answered. She told Mrs. Stripe that Mr. Stripe said,—that he asked if the mother and father were doing well, and she told him the mother was, and he ought to know whether the father was. But he said, he did not know about the father. When witness told Mrs. Stripe that, she said, that he was a liar and just wanted to "start something" on Dr. Meffert. The child was born on October 6, 1915. The doctor died March 29, 1916. Mrs Stripe had gone away to 36th and Agnes a month before the doctor's death. The doctor was very fond of children and of this Stripe child. Never heard the doctor speak of its parentage. Mrs. Stripe and the doctor never occupied the same room or the same bed to the knowledge of the witness. They had separate bed-rooms. On one occasion in October, 1914, when Mr. Stripe came over, Mrs. Stripe met him out in front and he greeted her with a kiss. Then they both came in and ate dinner. Mr. Stripe ate dinner at the house six weeks or two months before the baby came. He spent the whole afternoon that day with Mrs. Stripe in her room. He was working for the doctor then. The doctor dined with us. The child was christened by a Catholic priest. The doctor and his mother were both Catholics. Mrs. Stripe said, she was a Protestant. Dr. Meffert held the baby in his arms during the entire ceremony. They named the child, Frederick Meffert Stripe, before he was baptized. Never heard any discussion between Dr. Meffert and Mrs. Stripe with reference to the name of the child. Before Mrs. Stripe left 1622 Prospect and went to 36th and Agnes, there was such a disagreeable situation, that final-

ly she and the child went over there. The doctor went over to see the child, when it was sick. He never stayed there at night. He was sick at home for about ten days before he died. When witness found the doctor had not left her anything for her wages, she felt she had a claim against the estate. She put in a claim, to which Miss Anna Meffert consented. The doctor's mother died the 15th of December before the trial.

Bessie Baker testified: She lived at her uncle, Dr. Meffert's, for two years before November, 1914. A couple of weeks before she left, Mrs. Stripe came there, to board until her husband fixed up a place at 27th and Indiana. That is what Mrs. Stripe said. Mrs. Stripe would leave every evening after supper and say she was going to 27th Street to see Mr. Stripe. Mrs Stripe slept with the witness the first two or three nights she was there. After that she and her little daughter, Constance, slept together in the north bed-room. The witness worked for the Board of Education at the Public Library. Mrs. Stripe's being there had nothing to do with her leaving there. While she was there, they called plaintiff's mother, Mrs. Stripe, including the doctor. Never heard her called by any other name.

Mrs. Kate Abbot testified: She was a nurse and nursed Mrs. Stripe's baby at 1622 Prospect. Dr. Meffert introduced her to witness as Mrs. Stripe. No one there called her anything else. Mrs. Stripe paid her for her services when she left. The doctor seemed to think a lot of the baby.

Defendant Anna Meffert testified: She and her mother lived at Liberty. She was in the millinery business at Liberty, which her father, Dr. Joseph F. Meffert, started for her in the spring of 1905. She was at her father's house several times when Mrs. Stripe was there. Mrs. Dresslaer called her, "Mrs. Stripe." Her father said she was collecting rent for him. That was in the summer before her (Mrs. Stripe's) child was born. Witness and her father were always on good terms. He often called on her at her store in Liberty.

In rebuttal, plaintiff's mother denied saying that Mr. Stripe was a liar, when he said he did not know anything about who the plaintiff's father was. The other testimony in rebuttal was substantially as testified to before or unimportant.

At the close of the testimony, the court gave and refused certain instructions for plaintiff and defendants. Among those instructions refused for defendants, was a demurrer to the evidence.

The jury then returned a verdict answering the specific questions heretofore set out, and the cause was continued several times for the hearing of further testimony. On January 31, 1919, in lieu of further testimony, the parties agreed to submit a stipulation in said cause, and said cause was submitted on stipulation and taken under advisement.

On February 5, 1919, judgment was entered in which the court adopted the special verdict of the jury, and found that plaintiff was the legitimate child of Dr. Meffert, and not being mentioned in his will, said Meffert is deemed to have died intestate, as to the plaintiff. The court further found, that Sylvia C. Barrick had trans ferred her interest to defendants, Lawson, executor, and Anna Meffert with respect to which plaintiff and defendants entered into a stipulation, which is approved by the court, and provides, that if plaintiff is finally adjudged to inherit an interest in said property, his interest shall be charged with his proportionate share of $5,000, which said defendants paid said Sylvia C. Barrick for her interest in said estate. Said instrument further provided, that said cause be and the same is here and now finally submitted to the court for decree. Judgment was, therefore, entered for plaintiff, declaring, that he was entitled to an undivided one-half interest in the real estate described in the petition, subject to said stipulation, and the defendants to the remainder, subject to the will of said Meffert.

Within four days after the rendition of said judgment and at the same term of court, defendants filed

their motion for new trial, which being overruled, they appealed to this court.

I.   The first point made by respondent is, that the motion for new trial was not filed within four days from the filing of the verdict.   The statute requires the motion to be filed within four days "after the trial" of the case.   [Sec. 2025, R. S. 1909.]   Usually the trial, if the suit is at law, is ended with the coming in of the verdict, because that determines all of the issues necessary to found the judgment upon.   But in this case, plaintiff claimed the entire fee in the land.   Defendant Lawson, as executor, also claimed the entire fee, as trustee for defendant Anna Meffert.   The only issue submitted to the jury was whether plaintiff was Dr. Meffert's son, born of a marriage with Mrs. Stripe. No judgment for plaintiff could be based upon that finding alone.   The title of defendants, as claimed under the doctor's will, remained yet to be determined. Notwithstanding plaintiff might have been his son—and even his legitimate son—the will might have vested the entire estate in the daughter or others. Indeed, the daughter might have had an interest also by reason of her purchase from her co-defendant Sylvia C. Barrick, recited in the decree, because there is evidence, that said Sylvia was the doctor's daughter by a "secret marriage or something" with still another woman.   So that, whether the defendants or plaintiff had any interest in the land, and what interest, had to be, and was determined, after the special verdict in this case was rendered.   It was so determined by the court without the further intervention of a jury, but not until the day the judgment was rendered.   Hence, the trial continued until that date, and the motion for new trial, being filed within four days thereafter, was filed within the time required by the statute. This is true, whether the suit was in law or in equity.

II.   The respondent earnestly contends, that the proceeding is one strictly at law, and, therefore, we

cannot review the evidence and try the case *de novo*, but are bound by the finding of the jury and court below, as to the facts, and can only consider errors of law. It is true, that plaintiff vigorously contended below, that the suit was at law, that he was entitled to a jury trial and refused to waive a jury, so far as the issue of his legitimacy was concerned. But evidently, the court was of opinion, that it was a chancery case, or that the issue of plaintiff's legitimacy was an equitable issue; because it did not enter any judgment on said verdict, but adopted it as part of its findings of facts, and then rendered judgment thereon, as in equity cases. The verdict was treated as merely advisory, as in equity cases. The subsequent matters in issue, as well as the settlement with Sylvia C. Barrick, the approval and enforcement of which involved the exercise of the equity powers of the court, were disposed of by the court without a jury with respondent's acquiescence and consent. Under such circumstances, the case may well be ruled as having been tried below as a chancery case, with respondent's consent, and, hence, will be so tried *de novo,* in this court. Harwood v. Toms, 130 Mo. 225; Roselle v. Beckemeir, 134 Mo. 380.

*Appeal: Trial de Novo.*

III. Plaintiff bases his whole right to recover upon Section 342, Revised Statutes 1909, which is as follows: "The issue of all marriages decreed null in law, or dissolved by divorce, shall be legitimate."

The plaintiff claims, that he is the issue of a marriage "decreed" null in law, under this statute; that the word "decreed" is a clerical error for the word "deemed," which was in the law as originally passed by the Legislature, but was inadvertently changed to "decreed" in printing the Revision of 1865, and had been inadvertently retained in all the successive revisions of the statutes since that time. Learned counsel are in error. An examination of the original enrolled bill of the General Statutes of 1865, being Section 11 of Chapter 135, of such enrolled bill, in the office of the Secretary of

*Illegal Marriage: Legitimacy of Children.*

State, shows, that the word "decreed," not "deemed," is plainly written therein.  The issue raised under said section is of equitable cognizance, as has been authoritatively, and we think, correctly settled in this State in the case of Green v. Green, 126 Mo. 17, opinion by MACFARLANE, J.  In that case, this court said, pp. 22, 23, 24:

"The policy of our law is to make legitimate children of all marriages contracted honestly and in good faith by one of the parties.  The children of such marriages when entered into in good faith by one, or both of the parties, should not in right be stigmatized as bastards, and disinherited on account of the fraud of one, or the honest misapprehension of both of the parents.  To carry out this policy remedial statutes have been passed modifying the harsh common-law rule on the subject.  Thus our statute on the subject of divorce which gives one party a right to dissolve the marriage in case the other had a husband or wife living at the time it was contracted, expressly provides that no such divorce shall affect the legitimacy of the children [Section 4500.]  This provision has been retained on our statute books since the revision of 1845 and possibly longer. Again, under our statute law of descents and distribution it was declared as early as 1825 that, 'the issue of all marriages deemed null in law or dissolved by divorce shall nevertheless be legitimate.'  [Revised Statutes 1825, page 328, sec. 8.]

"The Act of 1825 was continued in force through the revisions of 1835 and 1845 without change.  In the revision of 1865 the word 'deemed' used in the original act was changed to 'decreed.'  So that the section reads: 'The issue of all marriages decreed null in law, or dissolved by divorce, shall be legitimate.'  This change has been continued through the revisions of 1879 and 1889. [R. S. 1889, sec. 4475.]

"Plaintiff now contends that under the act, as it now stands, the defendants are illegitimate and incapable of inheriting from their father, William Green, though his marriage to their mother was in entire good faith on

her part.  This contention is put upon the ground that there had never been a formal decree annulling the marriage.  We do not think the Legislature ever contemplated so radical a change in the law.  If the change had only appeared in one revision we would not hesitate to hold that it was made through inadvertence.  [Jones v. Driskill, 94 Mo. 200; Hyatt v. Wolfe, 22 Mo. App. 191; Turner v. Babb, 6 Mo. 347.]  "But, assuming that the word decreed was used intentionally, we think it should not be given the meaning attributed to it by plaintiff.  Assuming, as we do, that the word 'decreed' was intentionally used, we think the Legislature did not intend that its meaning should be materially different from the word 'deemed' used in the original act.  We think the act should be given a sensible and practical interpretation, and if upon the trial of a cause in which the legitimacy of children is involved, the evidence shows such a state of facts as would justify a court of equity in declaring the marriage null and void, the children of such marriage would be legitimate by virtue of the statute.  The Legislature may have contemplated that a decree to the effect that the marriage was void, should be entered when the fact is so found, and that may be the better practice, but we do not think it essential in order to give effect to the statute."

We hold the true interpretation of the statute is as above suggested by MACFARLANE, J., that the children to be legitimate thereunder must be the issue of parents between whom there was, not only a *marriage*, but such a marriage as would be decreed null in law, or dissolved by divorce in a proceeding in equity between the parties to such marriage.  In an action to annul a marriage in equity, for any reason, or for divorce, if both parties knowingly lived in adultery, there would be no marriage to annul, and neither would be an innocent or injured party, and neither would come into court with clean hands, and no relief would be granted to either.

Accordingly, we hold, in harmony with the case of Green v. Green, supra, and basic equitable principles, that unless such marriage is entered into by one or both

of the parents honestly, innocently and in good faith, it is not such a marriage as is contemplated by said Section 342. This conclusion is also supported by this court in the case of Nelson v. Jones, 245 Mo. l. c 597, where the court said: "In the Green Case some stress is laid on the good faith of at least one of the parties contracting the second marriage. It may well be that in order to constitute a marriage at all, there should be an element of good faith, a bona-fide intention to marry, as over against an intention to indulge a mere prank or mere casual sexual commerce."

We have also examined all the cases heretofore decided by this court construing this statute cited by counsel and in each case there was good faith on the part of one or both of the parents contracting the marriage. [Lincecum v. Lincecum, 3 Mo. 441; Johnson v. Johnson, Admr., 30 Mo. 80; Buchanan v. Harvey, 135 Mo. 276; Dyer v. Brannock, 66 Mo. 396; Bishop v. Brittian Inv. Co., 229 Mo. 699.]

Especially can there be no so-called common-law marriage, unless bottomed upon good faith—a bona-fide intention to create and enter into a legal marriage. [Perkins v. Silverman, 223 S. W. 895 (this court).]

The language of the court in the case of Stones v. Keeling, 5 Call. (Va.) 143, relied upon by respondent, as holding that under such a statute, as ours originally was, the marriage may be even criminal, as to both parents, was not necessary to the decision of the case and may be regarded as a mere *dictum*. In that case, the court said, page 146: "We cannot in this case say, that it was criminal. Circumstances may exist, such as a belief of the death of the first husband or a seven years' absence by him, which may render the second marriage even innocent."

Greenhow v. James, Exr., 80 Va. 641, rules that their statute does not contemplate an absolutely void and criminal marriage as to both parties. But neither said cases, nor cases from other states, cited by learned counsel for respondent, apply to our statute, since its amend-

ment in 1865 by inserting the word "decreed" in lieu of the word "deemed" in the original act.

We are all the more persuaded, that there must be a bona-fide marriage by at least one of the parents under said Section 342 of our statutes, by reason of the provisions of the immediately preceding Section (341, R. S. 1909) which is as follows: "If a man, having by a woman a child or children, shall afterwards intermarry with her, and shall recognize such child or children to be his, they shall thereby be legitimated." This section covers the case of an adulterine bastard, or a child born of a married woman and a man not her husband, with whom she has committed adultery. In such case, the question of good faith in the relations of the parents at the time the child was conceived or born is not regarded. Though their sins be as scarlet—yet, if they afterwards contract a legal marriage and recognize their children, such children shall stand legitimate before all the world. [Busby v. Self, 223 S. W. 729 (this court).] These two sections must be read and construed together, they supplement and complement each other. When so read, one (Sec. 342) covers the case, where there was a *marriage* between the parents, but it would be decreed null in law. There can be no marriage without a bona-fide intention to marry in compliance with the law of the State where the marriage is contracted, because marriage is a legal relation, and if the intention of the parties to it is to form a relation contrary to or in defiance of the law, they can have no intention to enter into a marriage at all. It frequently happens that parties in good faith intend to marry in compliance with the law—to form a legal relation—but it turns out that some fact exists, not within their knowledge at the time, which renders such marriage null and void in law, such as one or both of them having another spouse from whom they erroneously supposed they were freed by death or divorce, or they were related within the prohibited degrees of consanguinity, or other impediments of which they were

*Margin note:* Legitimation of Children.

ignorant, existed which rendered their marriage void. In all such cases, there would be a marriage which would be decreed null in law, to which said Section 342 would be applicable, and the issue of such a marriage would be legitimate thereunder. But Section 341 applies to cases where the relationship between the parties at the time the child was conceived, was illegal and criminal, as to both parents, and in such case, that section requires a subsequent legal marriage of the parents to make the children legitimate. Both sections were not intended to cover the same ground.

We hold, that said Section 341 governs, when there is no marriage, or, what is the same thing, where the alleged marriage was prohibited by law and absolutely void and criminal, as to both parents, and said Section 342 governs, when there was a bona-fide marriage, at least, so far as one of the parties was concerned, but yet would be decreed null in law.

IV.   This case is governed by said Section 341, and not by said Section 342, because the alleged marriage (if there was any such marriage, at all, which we need not pass on) between Dr. Meffert and Mrs. Stripe, was absolutely null and void and criminal, as to both parties—because both parties knew Mrs. Stripe was the wife of W. H. Stripe at the time their alleged marriage took place and during its continuance. It was doubly criminal on her part, because she was guilty both of adultery and bigamy. He was guilty of adultery and, perhaps, also of bigamy, because there was evidence that Sylvia C. Barrick was his daughter by a secret marriage with her mother which might have been valid and from whom he was never divorced. Every one is presumed to know the law. The acts of Dr. Meffert and Mrs. Stripe would still be as criminal, even though they had been ignorant of the law. But, in this case, we find that both of them, as a matter of fact, did know the law, and that their relations were a wilful and defiant crime against both the law of God and man, as they knew and believed it to be. For plaintiff to recover

*Adultery: Guilty Knowledge.*

under said Section 341, he would have to show, not only that he was the child of Dr. Meffert and Mrs. Stripe, but that after he was born, and their adulterous cohabitation was terminated, they consummated a legal marriage and recognized him as their child. This was never done.

V. It follows, also, from the undisputed fact that both Dr. Meffert and Mrs. Stripe knew she was the wife of W. H. Stripe, when their alleged marriage occurred and during its entire existence, even if this were a case strictly at law, the judgment would have to be reversed, because in that event the demurrer to the evidence before the jury, which passed on the special questions submitted to them, should hase been given. There was no evidence to sustain the finding of the jury, that there was a marriage between Dr. Meffert and Mrs. Stripe, within the meaning of either of said Sections 342 or 341 of our statutes.

Knowledge.

VI. Whether the plaintiff is, in fact, the son of Dr. Meffert, or Mrs. Stripe's husband, is not necessary for us to decide. The non-access of the husband is required to be shown in such cases by clear and convincing evidence; otherwise, the presumption is that the wife's husband, and not her paramour, is the father of her child. Nothing we have said is intended to convey the impression, that the plaintiff is not legally entitled to the name he bears. We do not pass on that point.

Presumption.

The judgment of the lower court is, therefore, reversed, and the cause remanded to the court below, with directions to set aside its decree heretofore rendered, and enter judgment, that the plaintiff has no right, title nor interest in the property sued for, but that the same is vested in the defendant, Lawson, executor, in trust for the defendant, Anna Meffert, under the terms of the will of said Joseph F. Meffert, deceased. *Brown* and *Ragland, CC.,* concur.

PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. All of the judges concur.