WILLIAM J. MAGET, RESPONDENT, v. BARTLETT BROS. LAND AND LOAN CO. ET AL. DEFENDANTS, BURNES NATIONAL BANK, APPELLANT.— 41 S. W. (2d) 849.

Kansas City Court of Appeals. June 15, 1931.

*Eastin & McNeely* for respondent.

*John C. Landis, Jr.,* and *John C. Landis, III,* for appellant.

CRANE, Sp. J.—This case has been the subject of most careful and elaborate consideration by the court. It has been briefed and argued with signal ability by counsel for both of the litigants. Judge BLAND and Judge ARNOLD have both written well considered opinions arriving however at different conclusions. On this account, because of the absence of Judge TRIMBLE, it was necessary that a special judge be called in. The writer of this opinion finds that there is very little difference in the statement of the case and facts in the opinion written by Judge BLAND and the one written by Judge ARNOLD. Finding himself in accord with the conclusion reached by Judge ARNOLD, the statement of the case and of the facts made by him is adopted as follows:

"This is a suit in equity seeking the recovery of two promissory notes secured by deeds of trust on real estate, or the equivalent thereof in cash, the petition alleging that possession of said securities was procured by defendants through fraud. At the close of plaintiff's case the court rendered judgment in favor of the loan company and at the close of all the evidence a decree was rendered in plain-

tiff's favor in the sum of $4490.60, against defendant Burnes National Bank. Said defendant bank has appealed.

The petition alleges that plaintiff on September 27, 1923, purchased from the defendant Loan Company securities valued at $6300 and gave his check to it in a like amount, drawn on the Bank of Dearborn; that said check was indorsed by the payee and deposited by it with the defendant bank "for credit;" that the payee received credit therefor on its account with said defendant bank; that the bank indorsed the check and forwarded it to the Bank of Dearborn, plaintiff having to his credit with said Dearborn bank more than sufficient funds with which to pay said check; that the Bank of Dearborn accepted plaintiff's said check and turned over to the defendant bank the sum of $50 in cash and its two drafts, one for $1750 and the other for $4500; that defendant bank received the drafts and money in payment of plaintiff's check to the Bank of Dearborn, whereupon that bank stamped the check as paid and charged the same to plaintiff's account; that subsequently the Dearborn bank suspended payment and was taken over by the State Finance Department for liquidation; that after its failure defendants falsely and fraudulently represented to plaintiff that his said check had not been paid and requested him to return the securities purchased by him as aforesaid and plaintiff was thus induced to surrender his said securities. The petition prays that the court enter a decree "restoring to him said note and deed of trust or its equivalent in value, and for all proper relief."

The defendant bank, in its answer, denies all of the allegations contained in plaintiff's petition and alleges that "subsequent to the transactions set out in plaintiff's petition" plaintiff and the Loan Company agreed to rescind the contract relative to the sale and purchase of the securities, and with "full knowledge of all of the facts and circumstances set out in plaintiff's petition," plaintiff surrendered and returned to the Loan Company the securities and received as full consideration therefor the sum of $50 in cash and the $4500 and $1750 drafts referred to in the petition. The answer further pleads—

"That this plaintiff had received and still is in possession of the consideration given to him by the Bartlett Brothers Land & Loan Company for the promissory note as aforesaid; that plaintiff did with full knowledge of all facts and circumstances alleged in his petition present to the commissioner of finance his claim against the Bank of Dearborn evidenced by the drafts above and herein referred to, and has received dividends declared by the said commissioner of finance on his said claim."

Plaintiff's reply to the answer of the defendant bank consists of a general denial and sets up that he had filed the claim with the

State Finance Commissioner "at the urgent request and solicitation of this defendant and on behalf of this said defendant" and in order to prevent a bar of his said claim and that "all dividends declared and paid on said claim constitute a proper reduction of the amount sued for in this action."

In appellant's supplemental record on rehearing is contained a separate demurrer by defendant bank to the petition on the ground that the petition "fails to state facts sufficient to constitute a cause of action." Said demurrer was overruled. Defendant again urges that plaintiff has no cause of action in equity, but as the case was tried by all parties as one in equity, it will be so treated here. [Stripe v. Meffort, 287 Mo. 366, 385, 386, 229 S. W. 762.]

The facts show that defendant, Burnes National Bank (hereinafter called defendant bank) is a national bank located in St. Joseph, Missouri, and that the Barlett Land & Loan Company (hereinafter called the loan company) is a corporation in said city engaged in making real estate loans; that on September 27, 1923, plaintiff, who lived at Dearborn, near St. Joseph, came with his father to the latter city, looking for a suitable investment for money plaintiff had on deposit in the bank of Dearborn; that plaintiff's father and and Mr. George A. Nelson, vice-president of the defendant bank, were boyhood friends and on account of this friendship they called upon Nelson and consulted him in respect to making the investment; that Nelson advised them to go to the loan company which they did and procured from it two notes secured by real estate mortgages aggregating $6300; that for these securities plaintiff gave his check to the loan company for $6300 drawn on the Bank of Dearborn; that plaintiff and his father then returned home, taking the securities with them.

On Friday, September 28, 1923, the loan company indorsed plaintiff's check to defendant bank and deposited it to its own account with the bank, receiving credit therefor. The check was deposited under a written agreement between the loan company and defendant bank, by the terms of which the defendant bank accepted checks from the loan company to be forwarded as its agent to banks outside of St. Joseph and without the assumption by defendant bank of any responsibility for the neglect, default or failure of such banks or for losses occurring in the mail; that should any bank convert the proceeds or remit therefor in checks or drafts which were dishonored, the amount for which credit had been given the loan company would be charged back to it, and it was further provided that in the absence of instructions to the contrary, items might be sent to the bank on which they were drawn without waiving or suspending the condition stated. The evidence further shows that in addition to said agreement there existed between the loan com-

pany and defendant bank, a custom that when any item or check of the loan company went through defendant bank which was not finally paid, the bank would charge it back to the account of the loan company; that sometimes bad checks deposited by the loan company were returned and sometimes they were, not. The Bank of Dearborn was also a depositor in the defendant bank and had an agreement with that bank similar to the written agreement between the loan company and defendant bank.

Defendant bank, on September 28th, forwarded plaintiff's check to the Dearborn bank, together with some other remittances, and enclosed it in what is called its remittance letter, reading "we enclose for *credit* items as stated below;" then appears in the letter six items aggregating $6490.85, among which was plaintiff's check. Plaintiff's check was received by the Bank of Dearborn on the morning of Saturday, September 29th, and there being a credit to plaintiff in that bank in a sum greater than the amount of his check, the check was entered upon plaintiff's account in that bank as a charge and the check marked "paid."

When plaintiff's check was received by the defendant bank it was charged to the account of the Bank of Dearborn. On the morning of September 28th the Bank of Dearborn had on deposit with defendant bank the sum of $1358.91 and on that day defendant bank sent the remittances already referred to to the Bank of Dearborn, amounting to $6490.85. This created an overdraft in defendant bank at the close of business on September 28th of $5131.89. On the morning of the 28th the bookkeeper of the Dearborn bank procured $1000 in cash from defendant bank, which caused the books of the latter to show an overdraft of $6131.89. On the morning of the 29th the bookkeeper of the Dearborn bank, at the direction of its president, made a deposit of $6250 to defendant bank, which that bank credited to the account of the Dearborn bank. This $6250 was represented by a draft for $4500 drawn by the Dearborn bank on the Commerce Trust Company of Kansas City and another draft in the sum of $1750 drawn by the Bank of Dearborn on the St. Joseph Stock Yards Bank, both checks being made payable to the defendant bank. The defendant bank gave the Dearborn bank credit for $6250 on account of the transaction. On the night of September 29th, the balance that the Dearborn bank had on deposit with the defendant bank was $94.11 as shown by the books, but this was later raised to $118.11 by reason of certain transactions not necessary to relate. The Dearborn bank had on deposit with the Commerce Trust Company and the Stock Yards Bank sufficient money to pay the drafts drawn upon them but the Dearborn bank having closed its doors on Monday, October 1st, the commissioner of finance stopped payment upon the drafts and they were returned a few days later to the defendant

bank. These drafts were transmitted to the banks upon which they were drawn by the defendant bank on September 29th. The drafts were presented on Monday, October 1st, but, as before stated, they were dishonored.

Plaintiff knew nothing of the course his check had taken or the transaction respecting it and after leaving the loan company on Friday he heard nothing more until the afternoon of Monday, October 1st, when he received a telephone call from someone he did not know but he testified "they said it was Mr. Bartlett" of the loan company. Plaintiff talked over the telephone but testified that he did not recognize the voice of the person talking. However, it was, apparently, Mr. Bartlett for on Tuesday, October 2nd, he and his father went to St. Joseph, arriving there on the morning of that day, and called at the office of the loan company. They saw Mr. Bartlett there, the man from whom plaintiff had purchased the securities. Plaintiff testified that Bartlett told him "he had not got his money" and wanted to know if they had seen Nelson; they replied that they had not and plaintiff's father called Nelson over the telephone; that, thereafter, he and his father and Bartlett went to the defendant bank and there talked with Nelson, who stated to them that "we (plaintiff) could not hold this mortgage and note;" that they (the loan company) "had not got their money on the check and the Dearborn bank had closed and they (the loan company) would sue me before the sun went down and it would cost me a lot of money;" that Nelson said the defendant bank had nothing to do with the transaction; that he and his father went to see Nelson on October 2nd because his father was "raised with him" (Nelson) and went to him for advice; that most of the conversation was had between Nelson and plaintiff's father; that plaintiff's father thought that plaintiff should give back the securities to the loan company; that plaintiff would not consent to do this at the time and said "let's go home." Nelson then said, "By the way, I believe I will go home with you;" "as the Dearborn bank has closed, probably I can loan some money," and "you had better get these mortgages and notes and give them to me while I am down there."

Plaintiff further testified that Nelson went to Dearborn with them; that after arriving there they went to the Dearborn bank and Nelson told plaintiff and his father what he had told them at St. Joseph; that "Nelson kept working on Dad to get him to give up these notes and mortgages" and told them that plaintiff's check had not been paid; that finally the father told plaintiff to get the securities and turn them back "or not to come to him for advice any more;" that plaintiff procured the securities and turned them over to Nelson who gave him a receipt for the securities, reciting:

"Received from W. J. Maget $6300 deed of trust. For which we have given him (plaintiff) $50 in cash and are to return to him the two drafts for $4500 and $1750, respectively, which we have mentioned. The receipt was signed "Bartlett Brothers Land & Loan Company by W. C. Bartlett by George A. Nelson;" that Nelson gave plaintiff the two drafts and $50 in cash and then Nelson left.

Plaintiff further testified that it was three weeks or longer before he heard anything further concerning the matter; that he and his father went to the defendant bank and saw Nelson about two months after Nelson left Dearborn and that at that time Nelson was trying to get him to take the two drafts in question, which were then in the possession of Nelson; that when plaintiff and his father went into the place of business of the defendant bank on this occasion "Nelson jumped up to shake hands with us and my father would not shake hands with him and told him that he was one who robbed us;" that Nelson told plaintiff that "he (Nelson) was the one that was tricked in the $6300 and if he would have told me so I would not have given the notes and mortgages back to him any more than I would have to the Bartletts;" that Nelson tried to get plaintiff to make a written proof of claim to be filed with the commissioner of finance upon the two drafts in question so that plaintiff could have a claim allowed in his favor, but plaintiff refused to take the drafts. Later, Nelson mailed the drafts and a form of claim to plaintiff at Dearborn, which plaintiff refused to accept but Nelson again mailed them to him on March 11, 1924, at which time plaintiff kept them and filed the claim and drafts with the commissioner of finance on March —, 1924. On February 15, 1924, Nelson wrote plaintiff that he had learned that plaintiff had not proved up his claim and "I understand you must file *your claim* and have it allowed in order to participate in the dividends." (Italics ours.) This letter was signed by George A. Nelson, president, and was written on the stationery of the bank. In the letter from Nelson to plaintiffs, written on March 11, 1924, Nelson stated that he was again tendering him (plaintiff) the two drafts, "in accordance with the receipt which you hold" and that "as you have been advised, claim must be made against the Bank of Dearborn by you prior to March 22nd, and I am sending these drafts to you by Registered Mail so that regardless of your having refused them in the past, you will be in position to prove up *your claim* and lose no rights. Kindly acknowledge receipt. Yours very truly, Geo. A. Nelson, Agent." (Italics ours.)

Plaintiff testified that he waited until the last Monday before the time for filing claims expired before he filed the claim with the commissioner of finance; that he made the claim because—"Nelson had worked on me to do it before this time was set to file it and I didn't

know that it would hurt me any to make a filing, because this money belonged to somebody;'' that ''he (Nelson) had worked on me to make the claim on this money;'' that Nelson said ''the bank would pay out in full and I would not be none the loser;'' that Nelson urged him to make the claim ''all the time he was trying to get me to take those drafts.''

. On cross-examination plaintiff testified that when he and his father went to the loan company's office on October 2nd, Bartlett advised them to call Nelson; that Nelson went with them to Dearborn where he (Nelson) stated to them that ''Bartlett had not received any money on your check,'' that ''Bartlett would sue me and cost me a lot of money and I would get all my money out of the bank'' (the Dearborn bank); ''. . . it would be better to claim against the bank and avoid a law suit;'' that he then talked to his father who told him that he had ''tried to raise me right and that he saw no other way;'' that his father said ''Bartlett had not received their money and for me to give it (the securities) back;'' that his father then told Nelson ''I was willing to give back the notes for the check;'' that when Nelson wrote out the receipt he said he would send the drafts to plaintiff and gave plaintiff $50 in cash. Plaintiff testified ''I didn't know what I was doing . . . I didn't ask him to give me back my check, didn't know where the check was, never mentioned the check in conversation'' except ''he (Nelson) mentioned that it had not been paid;'' that Nelson did not tell plaintiff that plaintiff's original check could not be given him because it was at the Bank of Dearborn; that it was six weeks or two months before ''I found out I wanted to go back on this agreement.'' That he consulted attorneys in reference to the matter before February 15, 1924, and that he had seen attorneys about the matter before he went to see Nelson, two months after October 2nd. He further testified that when he and his father and Bartlett went to the defendant bank on October 2nd, that Bartlett did not take any substantial part in the conversation.

It appears that there were three dividends declared upon the claim that plaintiff filed with the finance commissioner, one for twenty per cent and two for ten per cent each. There was testimony that the commissioner will pay further dividends. The dividends that plaintiff received upon his claim amounted to $2500. Plaintiff testified that at the time of the trial he had this money he had received on his claim and that he was willing to return not only the $50 paid him by Nelson but the dividends and the two drafts upon which the dividends were paid. On cross-examination he testified that he consulted two firms of attorneys before he went to the defendant bank the last, or third time; that he consulted them about ''my rights in reference to the Bank of Dearborn and the Burnes

National Bank'' about the surrender back of these papers; that he had not seen a lawyer at the time he returned the notes and mortgages; that he filed the claim with the commissioner of finance after he talked with a lawyer; that he filed the claims ''because that money had to belong some place . . . and if it had not been filed by somebody there would not anybody have any claim against it. I don't know who it belonged to.'' That ''Nelson kept insisting that I must file it;'' that he relied upon what Nelson said.

Plaintiff's father testified that when he and plaintiff went to see the loan company on October 2nd, Bartlett told them that he did not get his money and that ''he wanted the notes and deed of trust back. I asked him, 'the boy bought them to keep for the investment, if there could not be some way fixed for them to go through' and he said, 'not to his knowledge;'·'' that the witness called up Nelson and asked him if there was ''any way for that to go through,'' that ''the boy wanted to keep the papers'' and he, Nelson, said ''absolutely not.'' The witness did not think that Bartlett said anything in the interview they had with Nelson, that ''Mr. Nelson and I did the biggest part of the talking. It was along that line; that the boy wanted to keep his papers,'' and ''he said it could not possibly be done.'' ''He said the Bartletts would sue before night if he didn't turn those papers back—it would cost us a lot of money. We could get litigation any time. He said the check had not been paid; that the Bartletts had not got the money.''

The witness further testified that when they returned to Dearborn Nelson ''was urging the boy and urging me to get the papers back; that plaintiff's check had never been paid and that the Bartletts would sue plaintiff;'' that he advised his son to return the securities; that· Nelson gave plaintiff the receipt and the $50 in money; that the witness ''did not know why George Nelson gave him (plaintiff) the currency for two months;'' that about two months after plaintiff had turned back the securities, the witness and plaintiff went to St. Joseph to see some lawyers; that he and plaintiff called to see Nelson who wanted him to accept the drafts but the witness told Nelson he could not do it; that later he received a telephone call from Nelson asking that the witness have his son ''file his claim before it got too late;'' that the conversation had at the bank on October 2nd, ''was entirely between my boy and myself and George Nelson; I do not recollect any part that Bartlett took in the conversation.'' He testified that he was not influenced by anything that Bartlett said in the witness's advice to his son to turn the securities back. He further testified that he went with his son to consult attorneys before any claim was filed with the commissioner; that they gave their opinion to him as to ''whether he could win or lose.'' This was ''prior to the time that the drafts had been

offered to my son, and he refused to accept them." He did not go to attorneys "after the talk that my son had in the Burnes Bank."

He further testified that when Nelson, at the bank on October 22nd, stated that if the Bartletts did not get back the papers they would sue plaintiff before sun down, "Bartlett did not say a word;" that the witness never knew that defendant bank had any interest in the transaction until a month afterwards; that in the conversation at Dearborn, Nelson told him that "he could get back for my boy the two drafts if the boy would surrender the notes and mortgages. He told the boy these drafts would give him a preferred claim against the bank; that the boy could collect the claim against the bank;" that "the boy would get the drafts back but he did not say who could get them back to him." He further testified that he did not know until two months after October 2nd, that Burnes National Bank had cashed his son's check (for $6300). "I didn't know that Burnes National Bank had anything to do with it until two months afterwards."

The vice-president of the Dearborn bank, testifying for plaintiff, stated that when the defendant bank would send the Dearborn bank a remittance for collection from the latter—

"We might remit to them for the exact amount and we might remit to them for one thousand dollars or more or fifty dollars or one hundred dollars less, because we kept a balance with them at all times . . . I cannot tell exactly about how much currency or legal tender the bank (Dearborn) had on hand on the 29th of December. Possibly between $1800 to $3000. We did not have on the 27th, 28th or 29th of September, 1925, $6300 in cash. The last day of filing claims with the commissioner might have been the 23rd day of March, 1924. . . . The $6300 check which was received from the Burnes National Bank was received for collection and remittance. At that time the bank (Dearborn) had something between $1800 and $3000 in cash and had on deposit in various other banks amounts in excess of $6300. . . . I was handling this in the ordinary way. It was our custom to remit proceeds of checks sent for collection by draft."

Mr. Nelson, testifying for defendants, stated that plaintiff and his father came into defendant bank the latter part of September, 1923, and the father stated he was uneasy about the Bank of Dearborn and that he (plaintiff) wanted to get his money out of it; that the witness mentioned several investments and finally suggested that farm loans be purchased from the loan company and called up Mr. Bartlett and recommended to him plaintiff's father; that Bartlett said he had a loan he could sell to them and plaintiff and his father left; that the next conversation was on October 2nd at defendant bank when plaintiff and his father and Mr. Bartlett

came in. The witness admitted that he told plaintiff's father that the loan company "did not get their money" and if the notes and mortgages were not returned that the "Bartletts will sue you before the sun goes down." The witness testified that Mr. Bartlett was present and "made no remarks;" that on Monday, October 1st, he told Bartlett that the Dearborn bank had failed; that the two drafts in question were sent to defendant bank by the Dearborn bank and that the witness felt certain they would not be paid but would be returned, and advised Bartlett that he should see plaintiff and get the securities back; that the attorney for the defendant bank was present at the time and told Mr. Bartlett that the defendant bank "was in no way liable and that it was Bartlett's affair" and that his account would be charged back. Nelson testified that the defendant bank had always disclaimed any interest in the matter; that before leaving for Dearborn he asked Bartlett if he authorized him (the witness) to go to Dearborn and get the securities from plaintiff and give him a receipt for them in the name of the loan company by you" and Bartlett replied, "I do authorize you." He further testified that at Dearborn when he told plaintiff what he had said in Bartlett's presence at the defendant bank about the Bartletts not getting their money and that they would sue plaintiff before the sun went down, that he told plaintiff and his father that plaintiff's check was charged to his account by the bank (Dearborn bank) "but in lieu of that he would get these two drafts and $50. . . . I never told either of the Magets that the $6300 had not been charged to their account or had not been paid by the Bank of Dearborn."

Nelson further testified that after he came back from Dearborn he saw Bartlett and delivered to him the securities, saying, "I got these two mortgages" and that he told Bartlett that he gave the receipt to plaintiff and that he had signed the name of the loan company by W. C. Bartlett by George A. Nelson; that thereupon Bartlett said, "I will give you a check for these two mortgages" and Bartlett then gave him a check of the loan company for $6300 payable to defendant bank. The witness testified that if Bartlett had not done this, the account of the loan company would have been charged with the sum of $6300.

Nelson further testified that Bartlett never talked to him as a representative of defendant bank; that he told plaintiff at Dearborn that the two drafts had not been returned and when they were he would give them to plaintiff if plaintiff would come to the defendant bank; that he advised plaintiff to prove his claim against the Bank of Dearborn; that he should make the claim for $6250, represented by the two drafts; that the witness thought the Dearborn bank would pay out in full but he could not say positively that it would. On

cross-examination he testified that plaintiff's $6300 check was charged by the defendant bank to the account of the Bank of Dearborn and sent to that bank; that the charge of plaintiff's check to the Bank of Dearborn "made the Bank of Dearborn our debtor to the amount of $6300 plus the other items charged to them less their credit with us;" that as to the "*credit*" the books of defendant bank showed that the Bank of Dearborn had with defendant bank "credit did not make payment." There was no final payment until the check goes through; that he secured the dishonored drafts a few days after they were protested and about three weeks after receiving them sent them to the commissioner of finance in charge of the Dearborn bank for plaintiff; that the commissioner sent them back and the witness again, on March 11, 1924, sent them directly to plaintiff who did not return them. He testified that *in* all of these transactions he was the agent of the loan company.

Nelson further testified that when his bank received checks on the Bank of Dearborn, the former would charge the latter "and take it out of the account of the Bank of Dearborn;" that they would not mark the check "paid" but would send it to the Bank of Dearborn; that "this was a notice to the Bank of. Dearborn when they received that check that we had sent it to them and they were in the habit of crediting it to us when they got it." "Q. What was the exact time that the check would be finally paid? . . . A. No, it was not a final payment any more than when we clear items against any clearing house in town. It was presentation of payment." "Q. And the entries in your books were simply for the purpose of. keeping your records upon final payment of the bank upon which the checks were drawn? A. Keeping record of the final payment, yes."

An officer of defendant bank testified to admissions by Bartlett that he had authorized Nelson "to act as his agent" and that "at the time of the return of the farm mortgage that he (Bartlett) told Mr. Nelson that he had acted correctly and had acted as his agent."

Mr. Bartlett testified that—

"I believe I had had a talk with Mr. Nelson in the Burnes National Bank about the Bank of Dearborn on Monday morning, and that you (defendant's attorney) and Mr. Nelson and I had a discussion about this very matter."

That he did not recall that the attorney for the defendant bank told him that if, the two drafts came in and were not paid, it (defendant bank) would merely charge it back to the account of the loan company and "that would be the end of it." The witness would not say that the conversation did not occur. He did not recall that the

attorney for the defendant bank stated to him that plaintiff's check was—

". . . only taken for collection and that if not paid, it would be charged back to your account and what you would do with Mr. Maget is a matter entirely between you and Mr. Maget; that if Mr. Nelson could help you in any way, he would do so."

That he did not, subsequent to this time, ask Nelson to endeavor to obtain for the loan company the return of the securities and did not ask Nelson to use his influence to get plaintiff to return them; that he thought possibly some one from his office called plaintiff over the telephone on Monday, October 1st, about the matter; that plaintiff and his father came in the next day and asked if there was "any way they could keep the papers of these loans and I believe that I told them that I cannot think of any way;" that the witness suggested they talk to Nelson; that after plaintiff's father talked to Nelson over the telephone the witness went to defendant bank with them; that at the bank—

"I had very little conversation. I said very little to them while they were at the bank. I do not remember what Mr. Nelson said. I never heard Mr. Nelson make the statement that if they didn't deliver back to me the notes and mortgages that I would sue them."

Witness stated he had no recollection as to what was said in an effort to induce plaintiff to give back the securities; that he next saw Nelson on the afternoon of the same day when Nelson came into his office and delivered the securities to him; that he told the cashier to write out a check for $6300, which he handed to Nelson; that he could not remember what the conversation was but I probably asked him "how he happened to have them for me;" that either before or after he gave Nelson the check, Nelson told him that he signed the name of the loan company by himself to the receipt given to plaintiff.

Bartlett later testified that Nelson told him in the bank on the morning of October 2nd that it was immaterial to defendant bank what course plaintiff's check took; that if it was not paid by them, that defendant bank would charge the item back to the loan company; that he learned sometime on Monday or Tuesday, October 1st or 2nd, that defendant bank had received the two drafts and "I knew what the drafts were. It did not get back from the Burnes National Bank the check for $6300. The account with the bank was adjusted by giving Mr. Nelson when he returned the papers in the two loans, our check payable to the Burnes National Bank drawn on the Burnes National Bank for $6300." That when Nelson returned from Dearborn he told witness what he gave plaintiff for the securities, to-wit, the two drafts and $50 in cash.

The theory upon which plaintiff seeks recovery, briefly stated, is this: That when defendant bank accepted plaintiff's check ·from the loan company on September 28th, giving credit therefor on the loan company's account as a depositor, and on the same day charged the check to the account of the Bank of Dearborn, also a depositor, and the Dearborn bank accepted the check, stamped it "paid" and charged it to plaintiff's account, the transaction was closed insofar as plaintiff and the loan company were concerned; that plaintiff's check was then paid. In this connection plaintiff says that while it is true the charge created an overdraft against the Bank of Dearborn, this was a matter between the two banks and that "a payment by a bank of an overdraft amounts to a loan to the depositor;" that the agreement between the loan company and defendant bank in reference to taking checks on other banks and giving the loan company a conditional credit, does not apply in this case, because plaintiff's check was not forwarded to the Dearborn bank for collection, but, according to the letter of defendant bank transmitting the same, it was "for credit;" that the Burnes bank having paid it, it was for the credit of that bank; that instead of sending the check for collection as it could have done, defendant bank simply "charged the Bank of Dearborn's account with the items paid that day, thereby creating an overdraft in its favor against the Bank of Dearborn, a new and independent relation and one in which the maker and payee of the check were not concerned."

Plaintiff asserts that the two drafts of the Bank of Dearborn were not given to the Burnes Bank for the purpose of paying plaintiff's check, but were deposited in the defendant bank to the general credit of the Bank of Dearborn. The petition, however, alleges that the drafts were drawn in payment of plaintiff's check. It is also plaintiff's position that the fact that defendant bank did not debit the loan company's account with the amount of $6300 when the drafts were returned unpaid, but, instead, accepted a check of the loan company for $6300, shows the loan company's check was received to offset credit given when the deposit of plaintiff's check was made. Plaintiff urges that another evidence that his check was paid is that it was not returned to the loan company, but plaintiff further says that as a matter of fact this could not have been done because the check had been charged against the Dearborn bank and sent to it for credit; the latter bank had stamped the check "paid" and taken the sum out of plaintiff's account. In this connection, however, evidence as to the dealings between the loan company and defendant bank shows that where a check deposited by the former was not paid it was not always returned to the loan company; that while the loan company was given a provisional credit for the check deposited, its account was not always charged with the amount thereof

when it could not be collected, but sometimes the loan company would give a check to cover uncollected items. But plaintiff claims:

". . . the Burnes National Bank accepted the two drafts and gave the Bank of Dearborn credit on its account for them; it took them—not in payment of the Maget check—but in payment of the overdraft it held against that bank, made up of the Maget check and other items, including $1000 cash given to Gerald Skaggs on Saturday the 29th. It indorsed the drafts and sent them on—not for the purpose of collecting for the Bartlett Land and Loan Company the Maget check, but for the purpose of reimbursing itself for the advancement it had made to the Bank of Dearborn—the overdraft. This was a transaction in which it was principal and not merely the agent for collection. And when the drafts were refused payment, it had no escape except the course it took to deceive Maget into returning the notes so it could get a new check."

Plaintiff says that the loan company on October 2nd could have sued the bank when it refused to recognize the credit it secured by the deposit of plaintiff's check, instead of the loan company having the right, as Nelson stated at the time, to sue plaintiff should he refuse to return the securities. Defendant bank contends that Nelson at no time acted for it in procuring the return of the securities to the loan company and in making the representations which plaintiff claims were made to him and his father in order to procure the return of the securities, but that he acted solely as the agent of the loan company. The evidence is conflicting on this point and leaves the matter much in doubt as to whether or not Nelson was given authority to represent the loan company in the transaction. It appears, however, that the loan company had no information as to the manner in which plaintiff's check was handled by the two banks, nor of the bookkeeping entries made by them, nor is there any evidence that the loan company knew anything about the customary dealings between the two banks. It may be, if plaintiff's theory of payment of his check is correct, that Nelson, knowing that the loan company was not cognizant of the true situation, attempted to use that company in order to help defendant bank out of an embarrassing situation. It may be conceded there is substantial evidence in the record in support of plaintiff's position; and although Nelson may have been authorized to act for the loan company, this authorization was secured through suppression of the real facts from the loan company; Nelson, therefore, was acting for the bank in securing such agency, if not for the loan company too, in making the false statements, if any, relied upon by plaintiff and his father. Defendant bank, however, urges there was no payment of plaintiff's check; that plaintiff is relying merely upon the bookkeeping entries of the two banks, and not upon what really took place as to them; that

the said bookkeeping entries were merely for their convenience and that the fact that the Bank of Dearborn was charged with these items meant nothing more than a record by which the items could be traced.''

Having thus stated the case and the facts, Judge ARNOLD proceeds in his opinion with a conclusion as to the applicable law which is adopted, and made a part of this opinion as follows:

''As is our duty in an equity case, we have carefully read the record presented and the very able briefs of opposing counsel and our conclusion is that the proper determination of this appeal, with all issues raised therein, will be solved by the question, Was plaintiff's check actually paid? If so, the judgment should be affirmed. We shall therefore proceed to a consideration of the question as to when a check is paid. A general and concise answer to this question may not be given because of the varied elements entering into different transactions. In the case at bar, however, it is undisputed that when plaintiff gave his check in payment for the securities purchased, he had to his credit in the Bank of Dearborn more than sufficient funds to liquidate the amount of the check. It is further undisputed that when the check was forwarded by defendant bank to the Bank of Dearborn the latter had on hand in cash and cash credits in other banks a sufficient amount to pay same. Plaintiff's check for $6300 was received, accepted and stamped ''paid'' and the amount thereof credited to defendant bank. It was therefore ''cleared'' in bank parlance.

A similar situation to the one here presented was discussed and determined in Bank v. Miller, 228 U. S. 517, 520. Mr. Justice LAMAR delivered the opinion of the court and we quote from that opinion:

'' . . . When such bank performs the dual function of collecting and crediting the transaction is closed and, in the absence of fraud or mutual mistake, is equivalent to payment in the usual course. [National Bank v. Burkhardt, 100 U. S. 686, 689.] In the present case it was as though an officer of the Macon Bank had presented the check to the Teller of the Nashville Bank and on receiving the money had paid it back over the counter for deposits to the credit of the Macon Bank.''

To the same effect is the ruling in Bank v. Bank, 109 Mo. App. 665. It is the established law that when a bank receives a check from one of its depositors for collection it must return him either the check or the money. If the collecting bank surrender the check to the bank upon which it is drawn and accepts in lieu thereof a customer's check or other obligation (in this case cash and drafts on other banks), its liability is fixed as much as if it had received the cash. [Bank v. Bank, 151 Mo. 320; Gowling v. Express Co., 102 Mo. App. 366; Landa v. Bank, 118 Mo. App. 356.] When de-

fendant bank surrendered the check in question to the Bank of Dearborn and accepted in lieu thereof two drafts payable to the former, its liability was fixed. This amounted to payment of the check."

The law seems well settled that when a bank receives a check drawn on another bank for collection that there are two ways by either of which the check drawn on the second bank can be paid. One way is for the first transmitting bank to present the check to the second bank, the drawee, for payment. This way creates the relation of principal and agent between the two banks, the drawee bank being regarded as an agent for collection from itself for the transmitting bank. This was the way contemplated by the agreement between the Dearborn bank and defendant bank in this case as set forth in the printing on the deposit slips, *but said agreement also provided for instructions to the contrary.* It is clear in the case at hand that because the drawee bank, the Dearborn bank, was a depositor in the defendant bank, the defendant bank chose to be paid by the second method for payment of such checks,—which is the method known as the "reciprocal accounts" method of payment, whereby payment is accomplished on the books of the two banks and when such crediting and debiting is properly accomplished such is valid payment by operation of law. Federal Reserve Bank v. Millspaugh, 314 Mo. 10; Bank of Poplar Bluff v. Millspaugh, 313 Mo. 412, 417, 418, 281 S. W. 733, 47 A. L. R. 754, 761, 762, where the court followed the case of Federal Reserve Bank of Richmond v. Peters, 139 Va. 45, 123 S. E. 379 at page 382, 42 A. L. R. 742, 755 and 756 and quoted from it as follows:

"Also some cases have been ruled because of a reciprocal-accounts arrangement between the forwarding bank and the collecting bank. [Federal Reserve Bank of Richmond v. Peters, 123 S. E. (Va.) l. c. 382.] The reciprocal-accounts method and the remittance method are described in Federal Reserve Bank of Richmond v. Peters, supra, as follows: 'In order to make collections of checks handled by them banks usually adopt one of two methods, reciprocal accounts, or remittance. Under the reciprocal-accounts method, the collecting bank, upon receipt of payment of the checks, gives credit upon its books to the forwarding bank, and the forwarding bank charges the collecting bank upon its books. They settle from time to time according as the balance accumulates, with the one or the other. *Under this method, as soon as the collection is made the relation of the banks is that of creditor and debtor.* Under the remittance method the forwarding bank sends the checks to the collecting bank with instructions to collect them and remit immediately. The collecting bank is not authorized to retain the proceeds in its hands and therefore acts only as an agent for the forwarding bank.'" (Italics ours.)

*Washington Loan & Banking Company v. Fourth National Bank,* 38 Fed. (2d) 772, and especially note *Burnes National Bank of St. Joseph v. Sourway,* 28 Fed. (2d) 40. It is clear that the defendant bank was paid by the Bank of Dearborn by the ''reciprocal-accounts'' method because in the first place the two drafs amounting to $6250 which the Dearborn bank gave to the defendant bank on the 29th day of September, 1923, was $50 short of plaintiff's check on the Dearborn bank. In the second place the Dearborn bank had a credit of $1358.96 in defendant bank on the 28th of September, when the defendant bank received plaintiff's check from Bartlett Brothers. In the third place defendant bank loaned the Dearborn bank $1,000 in cash on the 29th of September before defendant bank received the two drafts for $6250 *in toto,* and finally, defendant bank forwarded plaintiff's check *for credit.* The inference is inescapable that the Dearborn bank gave defendant bank two drafts not in payment of plaintiff's check but to balance their accounts, for at the time the $6250 drafts were given the Dearborn bank owed the defendant bank $6131.89. There is no escaping the conclusion that the $1358.96 credit balance the Bank of Dearborn had in defendant bank on September 28th, went by the ''reciprocal-accounts'' method to pay part of plaintiff's check. The conclusion the defendant bank had been paid at the time the Dearborn bank failed is further fortified by the great and unusual efforts Mr. Nelson, Vice-president of the defendant bank, took to restore affairs to the *status quo.* Such activity and zeal is more probably explained by a desire to save his bank from loss than by any feeling of obligation to the Bartlett Brothers to save them from loss on the theory that plaintiff's check had not been paid. Nelson was in a position where he must be held to have known that the plaintiff's check was paid and he represented throughout, both to the plaintiff and to Bartlett Brothers, that the check had not been paid so that whatever action he took for the Bartlett Brothers, and whatever authorization he got from them was obtained by statements not in accord with the actual situation. Therefore, the Bartlett Brothers were quite properly dismissed from the suit and the whole inquiry turns upon the liability of defendant bank.

The secured notes were obtained from plaintiff by fraud or intentional misrepresentation of fact, as these terms are legally defined, by a person in a position of confidence and superior knowledge or better means of knowing.

It is not an agreeable duty to thus characterize the actions of the president of the defendant bank, but the court must face the facts as it finds them. When, because of the failure of the Dearborn bank, Nelson endeavored to secure the return from the plaintiff of the securities which were purchased from Bartlett, it was his duty to make to the plaintiff a full disclosure of all the facts and particu-

larly of the course which plaintiff's check had taken, which, as we have found, had at that time been treated as *paid* by the Dearborn bank. No one can read this record and reach the conclusion that such disclosures were made. In fact it stands virtually conceded that they were not made. On the contrary Nelson insisted that Bartlett had not been paid and unless the plaintiff gave up the securities which he had he would be "sued before sun down." Under the circumstances, delicate, involved and intricate as the situation was, not only was plaintiff entitled to all of the facts, but it seems to us also that he stood in need of competent legal advice before making his decision. It is clear, however, that the plaintiff gave up his securities partly because of the threats Nelson was making and partly because he was influenced by his father's advice, who in turn trusted Nelson and believed that it was the "right" thing for his son (the plaintiff) to surrender these securities as Nelson was demanding. However harsh it may sound, still the law brands such conduct as fraudulent.

The case was one properly triable in a court of equity. At least it is now too late to urge the contrary in an appellate court. [Stripe v. Meffert, 287 Mo. 366, 385, 229 S. W. 762.]

Other propositions are discussed in appellant's brief under Points III, IV and V, but in view of the conclusion which we have reached that plaintiff's check was in fact *paid,* and that return of the securities which he had purchased was accomplished by fraud and misrepresentations, the questions so raised and discussed by appellant become immaterial.

In view of all the circumstances we are forced to the conclusion that plaintiff did not ratify the original surrender of the securities by presenting the claim to the finance commissioner. Again this action was urged on him by Nelson, and was a part and parcel of the effort to make plaintiff instead of defendant the claimant to a division of the assets of the defunct Dearborn bank. The plaintiff presented these claims to the finance commissioner not as his own, and not because he was ratifying any agreement of rescission, but in order to protect the claim from being entirely lost, and to save whatever could be recovered for the true owner of the drafts. The whole transaction considered this action taken by him does not prevent his recovery in this case.

The judgment is affirmed. *Arnold, J.,* concurs; *Bland, J.,* dissents and files separate opinion; *Trimble, P. J.,* absent.

### DISSENTING OPINION.

It is well settled that in an action for rescission of a contract—

"The party defrauded will generally lose his right to rescind if he takes any benefit under the contract or does any other act which

implies an intention to abide by it or an affirmation of it after he has become aware of the fraud." [13 C. J. 524.]

[See, also, 9 C. J. 1199.] There is no doubt but that plaintiff ratified the contract made between Nelson and himself at Dearborn by his conduct in taking the property, to-wit, the two drafts of the Dearborn bank and the $50 in cash and retaining the same after he was fully cognizant of the facts which he now contends form the basis of the fraud that he alleges was committed upon him and after he had consulted attorneys. He not only used the two drafts as a basis of his claim filed with the finance commissioner in charge of the Dearborn bank after he knew the facts and for a long time had in his possession the check marked "Paid" and had secured legal advice, but received $2500 in dividends which he at no time before the trial offered to tender to either of the defendants. Aside from this, there is testimony that further dividends will be paid which he will receive. Plaintiff did not offer to make return of what he received upon these drafts in his petition or even offer to do equity, and only after the fact that he had taken an inconsistent position was pleaded in defendant's answer, did he mention the fact that he had received this amount from the finance commissioner. His excuse for proving up the claim with the finance commission is that he was over-persuaded by Nelson to do so, that the period during which the claim could be presented was about to expire and that someone was entitled to the claim. There is no evidence, or any pleading, of any fraud, accident, mistake or undue influence in reference to plaintiff's proving up his claim, and he took this action according to his own testimony after he had consulted attorneys. His reply alleges that he filed this claim on behalf "of this said defendant (defendant bank)" alone, but there is no evidence tending to show this. The letters written by Nelson to him urged him to prove up his claim for his own benefit and does not say anything about defendant bank's having any interest in the claim. They do not say anything about making the claim for the benefit of defendant bank. Plaintiff does not contend in his testimony that the bank ever requested him to make the claim for its benefit. The form of the claim shows that it was made on behalf of the plaintiff and he received the dividends and did not offer to pay them to anyone. Defendant bank was not insolvent and plaintiff did not prove his claim to prevent further loss to himself and he retained the dividends. Under the circumstances, I think that plaintiff is not entitled to rescind, and the judgment should be reversed. [Light & Power Co. v. Machine Co., 170 Mo. App. 224, 231; Brown v. Worthington, 152 Mo. App. 351; Bank v. Bank, 203 S. W. 662.]