Argued March 4, reargued September 10, 1953,
reversed January 6, 1954

# UNITED STATES NATIONAL BANK OF
# PORTLAND *v.* STONEBRINK ET AL.

265 P. 2d 238

*Manley B. Strayer,* of Portland, argued the cause for appellant. On the briefs were Platt, Henderson,

Cram & Dickinson, John E. Huisman and Thomas R. Williams of Portland.

*Arthur S. Vosburg,* of Portland, argued the cause for respondents and cross-appellants. On the brief were Flegel, Vosburg, Joss & Hedlund, of Portland.

Before LATOURETTE, Chief Justice, and ROSSMAN, LUSK, BRAND, TOOZE and PERRY, Justices.

LUSK, J.

This is an action brought by the United States National Bank of Portland (Oregon) to recover from the defendants the sum of $2,679.10 with interest, being the aggregate amount of nine school district warrants drawn on the St. Helens Branch of the plaintiff bank and deposited by defendants with its head office in Portland. Defendants were given credit for the amounts of the warrants in their deposit account and subsequently, through withdrawals, closed out the account. The warrants were deposited on different dates, the first on August 1, 1945, and the last on November 8, 1945. The court directed a verdict in favor of the plaintiff for $382.50, the amount of the warrant first deposited, and submitted to the jury the question of defendants' liability as to the balance of the claim. On that issue the jury found against the bank, and the result was a judgment for the plaintiff in the sum of $382.50, from which both parties have appealed.

The case is an aftermath of *School District 47 v. U. S. National Bank,* 187 Or 360, 211 P2d 723. The decision in that case determined the legal status of 114 warrants purportedly issued by School District No. 47 Joint, Columbia County, Oregon, among them the war-

rants involved in the case at bar. These instruments were fraudulently issued by the clerk of the school district. Some were made payable to existing persons, and the names of the payees forged by the clerk. In others the payees were fictitious persons, and their names were fraudulently endorsed by the clerk. The school district had a commercial account with the St. Helens Branch of the bank. The warrants on their face were payable at the St. Helens Branch which, upon their presentation, paid them and charged the school district's account. Upon discovery of the fraud perpetrated by its clerk, the school district sued the bank to recover the amount of these payments, and was awarded a judgment in the sum of $34,848.94, which was affirmed on appeal. The principal question was whether the warrants were checks and therefore negotiable or nonnegotiable instruments. We held that they were nonnegotiable instruments, and therefore that defenses interposed by the bank on the theory that they were checks were not available to it.

Hereinafter, for convenience we will refer to the main office of the plaintiff as the Portland office and to its bank in St. Helens as the St. Helens Branch.

The defendants in this case, who were partners, operated a billiard parlor in Portland under the assumed name of "Elite Billiard Parlor", and had a commercial account with the Portland office. They cashed the nine warrants involved in this case at the request of the fraudulent clerk of the school district, endorsed them, and, as stated, deposited them in their account and subsequently closed out the account. After the liability of the bank was sustained in the action brought against it by the school district, the bank brought this action to recoup, in part, its loss.

The bank bases its right of recovery upon the terms of the contract of deposit with the defendants, which reads:

"Depositor and Bank Agree: All items are credited conditionally at time of deposit for the convenience of the depositor, and may be forwarded for collection on the next business day after receipt. The bank may charge back any item before ultimate payment, whether returned or not, including items drawn on this bank, is not liable for losses in transit and may decline to honor checks drawn against conditional credits. All stop payment orders must be in writing and delivered to an officer of this bank. Depositor agrees to be bound by all clearing house rules applicable to the collection of any item."

The bank says that the Portland office never received "ultimate payment" of the warrants, and therefore, since the defendants' account has been closed out and the items cannot be charged back, it is entitled to a judgment for their amount. It claims also that defendants are liable on their endorsements. The defendants contend that the warrants were ultimately paid. They also plead as a first affirmative partial defense an estoppel, applicable to all the warrants except the one first deposited. A second affirmative defense was based on the theory that the loss was due to the negligence of the bank, and that as between it and the defendants, both innocent parties, the bank should suffer the loss.

The trial judge took the view that the warrants had not been ultimately paid, and so directed the jury to return a verdict for the bank on the warrant first deposited. He instructed the jury that the defendants were liable on the remaining warrants unless the defense of estoppel was sustained. He withdrew the issue

made by the second affirmative defense. The verdict of the jury amounted to a finding that defendants had established the defense of estoppel.

The plaintiff contends on this appeal that it was entitled to have its motion for a directed verdict for the full amount sued for allowed; the defendants urge on their cross-appeal that their motion for a judgment of involuntary nonsuit was erroneously denied, and in any event that the issue of estoppel was properly submitted to the jury and the judgment should be affirmed.

In view of our conclusion upon the question of ultimate payment, further reference to the affirmative defenses will become unnecessary.

Preliminarily, it must be determined whether the Portland office and the St. Helens Branch of the United States National Bank are to be regarded, for the purposes of this case, as a single entity, or as separate and distinct banks.

The St. Helens Branch was established pursuant to the provisions of Title 40, ch 21, OCLA (Title 8, ch 72, ORS). Section 40-2201, (ORS 72.020) provides:

"For the purpose of this act: (a) Bank. The term 'bank' shall include any corporation or national Banking association engaged in the business of receiving and paying deposits of money within this state. A branch or office of any such bank shall be deemed a bank for the purpose of this act. * * *"

Section 40-2111, OCLA, (ORS 714.120) provides:

"Any check note or other instrument providing for the payment of money and drawn on or payable at one office or branch of any bank organized under the laws of or doing business in this state, and received for deposit or collection or for any other purpose at another office or branch of such

bank, shall be deemed for all purposes as drawn on or payable at another bank. Any provision of this section may be modified or set aside by an agreement in writing between any such bank and any party from whom any check, note or other instrument is received for collection, deposit or other purpose.''

■ We think that this statute clearly applies to the transaction involved in the present case. It cannot be said, as counsel for defendants suggest, that the sole purpose of the statute was to make inapplicable the rule of *Price v. Neal,* 3 Burr 1354, 97 Eng Rep 871, to transactions coming within its purview. Doubtless it has that effect. The rule of *Price v. Neal* has been carried into the negotiable instruments law of this state: §§ 69-503, 69-1002, 69-1005, OCLA (ORS 71.185, 71.188); *First National Bank v. Noble,* 179 Or 26, 60, 168 P2d 354, 169 ALR 1426. ''A bank is bound to know the signatures of its depositors, and therefore, if as drawee a bank pays a check to which is signed the name of one of its depositors, it does so at its peril.'' *First National Bank v. U. S. National Bank,* 100 Or 264, 273, 197 P 547, 14 ALR 479. Under the statute, branches of the same bank being regarded as separate banks, the Portland office of the United States National Bank would not be bound to know the signature on a check drawn on the St. Helens Branch by a depositor of the latter. But the statute provides that an instrument drawn on one office or branch and received for deposit or collection at another shall be deemed *for all purposes* as payable at another bank. One such purpose would be that of determining the question of the rights and liabilities of the parties as between a branch and its depositor when the former has received from the latter for collection a check or other instru-

ment drawn upon another branch of the same bank. In such a case the bank of deposit is to be regarded as a collecting bank to the same extent as if the drawee bank were an entirely separate institution; or, to use the language of counsel for the plaintiff on the trial, as though the drawee "had been the First National Bank or the Bank of California."

Without the aid of statute, indeed, a similar conclusion was reached in *Dean v. Eastern Shore Trust Co.,* 159 Md 213, 150 A. 797. The question there was whether a branch bank which had cashed a check drawn on another branch, payment of which was subsequently refused by the drawee because it had been countermanded, could recover the amount of the payment from the drawer. If the branches were to be deemed identical with the main bank, then, as the court said, "when the Eastern Shore Trust Company paid the check at its Cambridge Bank, the check was discharged by payment, and the entire transaction closed." But, since the branches were held to be separate entities for the purposes of such a case the plaintiff bank could recover as a holder in due course. The court said:

"* * * The term 'branch,' when applied to such institutions, naturally implies the existence of an organization sufficiently complete to transact such business as is ordinarily done by a bank, such as discounting negotiable paper and receiving deposits and paying them out on demand. And, while its branches are parts of a single organization, nevertheless, in dealing with third persons, they may properly be regarded as so far separate and distinct that, in respect to such transactions as discounting commercial paper, and receiving and paying out deposits, when so earmarked as to identify them as local to some specific, ascertained and named branch, such branch will for the purposes of

that transaction be regarded as a separate and complete entity. Any other rule would not only lead to intolerable confusion and inconvenience, but would virtually destroy the value of the privilege which the State has given to banking institutions to establish branches.''

The court further said that the provision of the Bank Collection Code which declares that, for the purpose of such Code, ''the term 'bank' shall include a branch or office of a bank, tends to strengthen that conclusion.'' See, also, 9 CJS 87, Banks and Banking § 55.

It may be hazarded that considerations such as the Maryland court referred to influenced the enactment of § 40-2111, OCLA (ORS 714.120). We have no doubt that the statute applies here, and we accept as correct the following statement in plaintiff's reply brief of the theory of its case:

''* * * Appellant herein *as the bank of deposit* of the warrants seeks recovery upon the deposit contract. There is no fault on its part with respect to the warrants. It accepted them for deposit according to the terms of this contract. It now seeks to enforce the deposit contract for the reason that it has not received ultimate payment. This action does not concern the St. Helens Branch of the Bank except as to the dealings with appellant's main branch as they bear on the question of whether there has been ultimate payment of the warrants.'' (Italics added.)

This being the position of the case, the rights of the parties must be determined not only by the contract of deposit, but also by certain provisions of the Bank Collection Act to which attention will presently be called.

The evidence relevant to the question of "ultimate payment" may be briefly stated. Upon the deposit of each warrant with the Portland office, defendants' account was credited and the warrant forwarded to the St. Helens Branch which marked it "paid", charged the amount against the account of the school district, and credited the Portland office. The credit stood until after the decision of this court in *School District 47 v. U. S. National Bank,* supra, which was rendered November 15, 1949. Mr. Walter F. Neubert, assistant cashier of the plaintiff bank, testified concerning the procedure that was followed. He testified that as between the main office of the bank and its various branches settlement of accounts was not made through the clearing house, but directly between the main office and the various branches. We quote from his testimony:

"Q From what Mr. Henderson's explanation was he asked you, and I may be wrong, but he is claiming that for nine warrants involved in this case that a charge was made. What did you testify to about those nine warrants? Did you make any testimony at all?

"A That the warrants were paid and that we had, after they were charged, the bank had to reimburse the school district down there and we are holding that sum at head office pending the outcome of this case.

"Q All right; what I am getting at is what your testimony is: That you reimbursed the school district and the one branch has a charge against the other branch at the main office?

"A Yes, sir.

\* \* \* \* \*

"Q Isn't it a fact that all of these warrants that were drawn by School District 47 Joint were charged against the account of the Columbia County—your St. Helens branch?

"A I presume they were.

"Q And they remained a charge against Columbia County, or against School District 47 Joint, until you reimbursed them, did they not, as a result of this lawsuit that they brought against you?

"A Yes, sir.

"Q All right. Now when and at what time did you first charge them back against the United States National Bank main branch?

"A At the end of the lawsuit, which would— I have here November 30, 1949.

＊　＊　＊　＊　＊

"Q And when was the first time you say this account was charged, as far as the St. Helens branch is concerned, to the main branch? What was that date again?

"A At the end of the suit, November 30, 1949.

"Q November 30th, what was it again?

"A November 30, 1949.

"Q So up until November 30, 1949 as between the St. Helens branch and the main branch the transaction, as far as these warrants were concerned, had been completed?

"A No, because there had been discussion back and forth in between that time.

"Q All right, but it wasn't until November 30, 1949 that the charge was made between the two banks as to the amount of these warrants the St. Helens branch had cashed.

"A That was the time we were asked to reimburse the school district.

"Q And that is the time you set up the item that you claim as reimbursement, is that right?

"A That is right."

By the terms of the agreement subject to which the warrants were deposited it was provided that the items were "credited conditionally at the time of deposit", and the Portland office reserved the right "to charge back any item before ultimate payment." As we have

seen, the Portland office and the St. Helens Branch maintained reciprocal accounts. The method of handling items forwarded for collection which they employed is thus described in 9 CJS 497, Banks and Banking § 242:

> "* * * Under the reciprocal accounts method the collecting bank, on receipt of payment of the item, gives credit on its books to the forwarding bank and the forwarding bank charges the collecting bank on its books, the banks settling from time to time with the one or the other in accordance with the accumulated balance."

We now call attention to §§ 40-2202 and 40-2209, OCLA, (ORS 72.030 and 72.090) which are parts of the Bank Collection Act. (It should be observed that, whereas in the text of CJS from which we have just quoted the bank to which an item is sent for collection is referred to as the "collecting bank", the statute uses the term "agent collecting bank" in such a way as to apply to a bank which forwards an item for collection.)

Section 40-2202, OCLA, (ORS 72.030) provides:

> "Except as otherwise provided by agreement and except as to subsequent holders of a negotiable instrument payable to bearer or indorsed specially or in blank, where an item is deposited or received for collection, the bank of deposit shall be agent of the depositor for its collection and each subsequent collecting bank shall be subagent of the depositor but shall be authorized to follow the instructions of its immediate forwarding bank and any credit given by any such agent or subagent bank therefor shall be revocable until such time as the proceeds are received in actual money or an unconditional credit given on the books of another bank, which such agent has requested or accepted. Where any such bank allows any revocable credit for an item to be withdrawn, such agency relation

shall nevertheless continue, except the bank shall have all the rights of an owner thereof against prior and subsequent parties to the extent of the amount withdrawn.''

Section 40-2209, OCLA, (ORS 72.090) provides:

"Where ordinary care is exercised, any agent collecting bank may receive in payment of an item without becoming responsible as debtor therefor, whether presented by mail, through the clearing house or over the counter of the drawee or payor, in lieu of money, either (a) the check or draft of the drawee or payor upon another bank, or (b) the check or draft of any other bank upon any bank other than the drawee or payor of the item, or (c) such method of settlement as may be customary in a local clearing house or between clearing banks or otherwise; *provided, that whenever such agent collecting bank shall request or accept in payment an unconditional credit which has been given to it on the books of the drawee or payor or on the books of any other bank, such agent collecting bank shall become debtor for such item and shall be responsible therefor as if the proceeds were actually received by it in money.''* (Italics added.)

The statute does not define ''unconditional credit'', doubtless because no definition was considered necessary. The difference between a conditional and unconditional credit is illustrated by the contrast between the provision of the deposit contract, crediting items to a depositor's account conditionally and subject to be charged back before ultimate payment, and the total absence of evidence as to any similar stipulation with regard to the credits given by the St. Helens Branch to the Portland office for the amounts of the warrants herein involved. There is authority supporting the view that, if the terms of the deposit contract were in conflict with the applicable provisions of the Bank

Collection Act, the former would control. *Leonardi v. Chase National Bank,* 33 NYS2d 706. But we may pass the question because here there is no such conflict. "Ultimate payment" may mean the same thing as payment by an "unconditional credit". There was such a credit given in this case, and therefore ultimate payment within the meaning of the contract. The relationship between the Portland office and its depositor thereupon changed from that of principal and agent to creditor and debtor *(Security Savings & Trust Company v. King,* 69 Or 228, 231, 138 P 465), both under the express terms of the statute and under court decisions interpreting similar transactions when not governed by statute. The rule is thus stated in 6 Michie, Banks and Banking (Perm ed) 19, § 9:

> "* * * The general rule is that if a collecting bank forwards a check directly to the drawee bank, and by custom or agreement it is authorized to credit the collecting bank and remit, or settle at stated periods, its receipt of the check, debiting it to drawer and crediting it to the collecting bank, constitutes payment and renders the forwarding bank liable to its principal for the amount stated."

Among numerous decisions supporting the text are the following: *Briggs v. Central National Bank,* 89 NY 182, 42 Am Rep 285; *Stone v. Wachovia Bank & Trust Co.,* 145 SC 166, 143 SE 27; *Pinkney v. Kanawha Valley Bank,* 68 W Va 254, 69 SE 1012; *Maget v. Bartlett Bros. Land & Loan Co.,* 64 Ark 247, 41 SW2d 849; *Dean Tobacco Warehouse Co. v. American Nat. Bank,* 173 Tenn 365, 117 SW2d 746, 118 ALR 360 (in which the deposit contract provided "All items are credited subject to final payment in cash or solvent credits"); *First Trust & Savings Bank v. Kent,* 119 F2d 151. The same rule prevails where credit is given to the bank of de-

posit by an intermediate collecting bank. *Leonardi v. Chase National Bank,* supra; *People v. Sheridan Trust & Savings Bank,* 358 Ill 290, 193 NE 186, cer den 295 US 740, 79 L ed 1687, 55 S Ct 654 (where the deposit contract provided that credit was conditioned upon payment in cash or solvent credits). See, also, 2 Morse on Banks and Banking (6th ed) 994, § 451, Note 1; 9 CJS 497, Banks and Banking § 242, 501 § 245, 507 § 248. As illustrative of the holdings in these cases particular attention is called to *Briggs v. Central National Bank,* supra, which was an action brought to recover the amount of a check drawn on the First National Bank of Newark and delivered by plaintiffs to the defendant bank for collection. The drawee was collecting agent for the defendant in New Jersey under an agreement that all collections made should be credited to defendant in a collection account which was settled every Tuesday. Defendant forwarded the check to the drawee by mail. It was received June 10, 1880, and was charged to the drawer, who was a customer and credited to defendant in said collection account. The next day the drawee suspended business and went into the hands of a receiver. The court, after referring to the agreement concerning collections between the two banks, said:

"* * * There can be no doubt that the drawee of the check had the right under this arrangement to discharge the drawer, and substitute itself as debtor to the defendant for the amount, and that it did so, and that the defendant must be regarded as having accepted the responsibility of the drawee, upon its credit in the collection account, as payment of the check.

"Under these circumstances the liability of the defendant to the plaintiff for the amount, as for a collection effected, is beyond question."

Plaintiff's counsel in their brief do not challenge the rule announced by these authorities, but question its application to the facts of this case because of the evidence of the witness Neubert. They argue that Neubert's statement that up until November 30, 1949, the transaction was not closed "because there had been discussion back and forth in between that time" is evidence that the Portland office had not accepted the St. Helens Branch as debtor for the amount of the warrants. We do not agree.

■ The nature of these discussions is not shown, nor when they took place. For all that appears it may have been after discovery of the fraud, which was in August, 1946. Plaintiff had the burden of proof. There is no evidence whatever that the credits were given otherwise than in the regular course of banking business and as payment of the items involved, or that they were not accepted as such by the Portland office. It is established without contradiction that the items were carried on the books of the St. Helens Branch as charges against the account of the school district and as credits to the Portland office until November 30, 1949, after the conclusion of the litigation between the school district and the plaintiff. It was not until April, 1948, after the decision of that case in the Circuit Court, that the plaintiff made demand on the defendants for reimbursement. The judgment in the Circuit Court was adverse to the plaintiff, and the demand was that the amount of the warrants be paid by the defendants in the event that the judgment should be affirmed on appeal. In the meantime defendants had closed out their account with the Portland office, exhausting the credits arising from the warrants. It is safe to say, for there is nothing to the contrary, that until withdrawn the

Portland office treated the money as its own. In the face of these facts it is idle to argue that the conclusion of the witness Neubert that the transaction was not closed, and his vague statement concerning discussion at some undisclosed time between the two banks relative to the warrants, amounts to substantial evidence that the credits were not accepted by the Portland office as payment of the warrants. The question whether the credits were absolute or conditional must be determined from the evidence of what occurred at the time of the transactions, not from the conduct of the two banks after discovery of the mistake made by the St. Helens Branch in paying the warrants. As the court said in *Federal Reserve Bank of Richmond v. Peters,* 139 Va 45, 123 SE 379:

"* * * Under the reciprocal accounts method, the collecting bank, upon receipt of payment of the checks, gives credit upon its books to the forwarding bank, and the forwarding bank charges the collecting bank upon its books. They settle from time to time according as the bank balance accumulates, with the one or the other. *Under this method, as soon as the collection is made, the relation of the banks is that of creditor and debtor."* (Italics added.)

The foregoing is quoted with approval in *Maget v. Bartlett Bros. Land & Loan Co.,* supra.

And in *Dean Tobacco Warehouse Co. v. American Nat. Bank,* supra, it was held that the fact that the forwarding bank (which suspended business the day after credit for the collection was given by the drawee bank) had received no notice of the credit was immaterial, the court saying: "When the credit was given the transaction was completed. The notice of the payment of the check was not part of the transaction itself, but only evidence of the transaction."

■ We conclude that the Portland office received ultimate payment of the warrants by means of unconditional credits given it by the St. Helens Branch. There is no conflict between this holding and the decision in *Security Savings & Trust Company v. King,* supra, that the issuance of a draft in payment of a check by an intermediate collecting bank to the bank of deposit did not constitute compliance with the condition of the deposit contract, that the bank "should only be held liable when proceeds in actual funds or solvent credits shall have come into its possession", the bank of deposit having been given telegraphic notice before receipt of the draft that the drawee bank had overlooked a stop order and honored the check in error. The case is explained and distinguished in *First National Bank v. Noble,* supra, 179 Or 62-65. While the facts of the case at bar are quite different from those of *First National Bank v. Noble,* the decision in the latter case that a cashier's check is a solvent credit and constituted "ultimate payment" within the meaning of a bank deposit contract is in entire harmony with our conclusion here.

■ In its printed briefs plaintiff relied solely as its ground of recovery upon the claim that the warrants had not been ultimately paid. Upon the oral argument, however, it was contended that the defendants are liable in any event upon their endorsements of the instruments. It has been further suggested that plaintiff had a right of restitution for money paid under a mistake of fact. But the plaintiff, "as the bank of deposit of the warrants", has no standing to urge these contentions. As an agent for collection of money which it received and paid over to its principal it has fulfilled its undertaking. It was under no duty to reimburse the

St. Helens Branch after discovery of the fraud, and could not have been legally compelled to do so. That was a purely voluntary payment, for, as stated by Mr. Justice Cardozo (then chief judge of the New York Court of Appeals) in *Carson v. Federal Reserve Bank*, 254 NY 218, 172 NE 475, 70 ALR 435, the rule is that "money paid to an agent, and lawfully accepted, may not thereafter be reclaimed by one who has made the payment with notice of the agency, if before the attempted reclamation the agent in good faith has settled with the principal." See, also, *National Park Bank v. Seabord Bank*, 114 NY 28, 20 NE 632, 11 Am St Rep 612; Restatement, Agency § 339 and Comment f, p 747; 2 Am Jur 264, Agency § 336. The rule does not apply where the fund has not been actually paid over, but is held by the agent as a debtor. *Carson v. Federal Reserve Bank*, supra; *Turetsky v. Morris Plan Industrial Bank*, 22 NYS2d 514. That, of course, is not the case here. Withdrawals from the account lawfully made by the defendants, who were themselves free from fault, brought about payment to the principals of the money collected by their agent. Thus we have precisely the situation disclosed by *National Park Bank of New York v. Seabord*, supra. There the drawee bank, acting under a mistake of fact, paid to the collecting bank a check which had been made out for $18 and fraudulently raised to $1800. The funds were placed to the credit of the principal by the collecting bank and drawn out by him. The ruling, as explained by Mr. Justice Cardozo in the Carson case, was that the collecting bank "could no longer be held to restitution at the suit of the drawee bank after the drafts of the account current had exhausted the credit balance existing at the time of the collection." If the Portland office of the United

States National Bank has suffered a loss it is one which it brought on itself by a restitution which it was under no legal obligation to make. In these circumstances it can have no recourse against the defendants.

■ It was error for the circuit court to direct a verdict for the plaintiff for the amount of the warrant first deposited with the Portland office by the defendants, and error to deny the defendants' motion for judgment of involuntary nonsuit. The judgment must therefore be reversed, and, as the facts are not in dispute, judgment will be entered here for the defendants. Art. VII, § 3, Constitution of Oregon.